726 F.2d 956
 4 Employee Benefits Ca 2577
 William I. WALSH, on his own Behalf and on Behalf of all
Those Similarly Situated,
v.
The GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., a
corporation organized under the laws of the State of
Maryland, Employees' Retirement Plan of the Great Atlantic &
Pacific Tea Company, Inc. and Participating United States
Subsidiaries, Bankers Trust Company, Rosemarie Baumeister,
Harold J. Berry, Walter D. Dance, Christopher F. Edley,
Helga Haub, Barbara Barnes Hauptfuhrer, Sidney A. Kohl, Paul
C. Nagel, Jr., Eckart C. Siess, Fritz Teelen, Henry W.
VanBallen, and James Wood, individually and as members of
the Board of Directors of the Great Atlantic & Pacific Tea
Company, Inc., Philip E. Hoversten, Robert G. Ulrich and H.
Nelson Lewis, individually and as members of the Retirement
Board of the Great Atlantic & Pacific Tea Company, Inc.,
Erivan Haub, individually and as a partner in a partnership
known as Tengelmann Warenhandelsgesellschaft, a partnership
organized under the laws of West Germany, and Tengelmann
Warenhandelsgesellschaft and Ernst Bodarwe.
Appeal of William I. WALSH.
 No. 83-5279.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 25, 1983.
Decided Dec. 29, 1983.
Rehearing Denied Jan. 27, 1984.
 
 Donald J. Williamson (argued), Williamson & Rehill, P.A., Newark, N.J., for William I. Walsh.
 Milton S. Gould (argued), Shea & Gould, New York City, Marc S. Friedman, Kalb, Friedman & Siegelbaum, Roseland, N.J., for class appellees.
 Cahill, Gordon & Reindel, New York City, Connell, Foley & Geiser, Newark, N.J., for The Great Atlantic & Pacific Tea Company, Inc., et al.; Denis McInerney (argued), Henry G. Bisgaier, R. Anthony Zeiger, New York City, of counsel.
 Before GIBBONS, GARTH and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 William J. Walsh, a retired employee of The Great Atlantic & Pacific Tea Company, Inc. (A & P), appeals from an order of the district court approving a settlement of a class action brought by him under sections 502(a)(2) and (3) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Sec. 1132(a)(2), (3) (1976), on behalf of participants in the A & P Employees' Retirement Plan. Walsh advances several reasons why the order should be set aside, none of which has merit. Thus we affirm the settlement.
 
 I. Background to the Class Action
 
 2
 In 1948 A & P adopted a defined-benefits Employee Retirement Plan. The Plan provided that A & P would make contributions "in such amounts as, in the light of actuarial requirements, may be deemed necessary ... to provide the benefits under the Plan ...." 1948 Plan, Sec. 5(1), App. at 1097-98. A & P reserved the right to terminate the Plan at any time. Section 8(2) of the 1948 Plan provided that in the event of Plan termination, funds of the Plan were to be used "solely for the benefit of members and retired members or their contingent annuitants ... except that such excess funds as may exist because of erroneous actuarial computation shall be returned to the Company." 1948 Plan, Sec. 8(2), App. at 1102 (emphasis added). A & P also reserved the right to amend the Plan, "retroactively or otherwise, ... provided that no such modification or amendment shall make it possible for any part of the funds of the Plan to be used for, or diverted to, purposes other than for the exclusive benefit of members and retired members or their contingent annuitants ... prior to the satisfaction of all liabilities with respect to such members, retired members and contingent annuitants." 1948 Plan, Sec. 10, App. at 1106 (emphasis added).
 
 
 3
 By 1973, largely because of a contraction of A & P's business and a consequent reduction in its work force, the funds in the Plan substantially exceeded its obligations for defined benefits. Coincidentally, in that year Gulf and Western Corp. initiated a hostile tender offer for A & P stock. According to an affidavit of Arthur Melervey, Assistant General Counsel to A & P from 1971 to 1975 and the company Secretary thereafter, A & P's management believed that these excess funds, reachable by virtue of section 8(2), were alluring to tender offerors, who might obtain and syphon off the funds or merge the Plan with one of their own less-generously funded pension plans. Thus in 1973 A & P amended section 8(2) to provide that "[w]ith respect to any funds remaining in the Plan following the satisfaction of all allocations hereinbefore set forth, such funds shall be applied pro-rata to the benefit of each class hereinbefore set forth as determined by the actuary of the Plan." 1973 Plan, Sec. 8(1)(g), App. at 1109-10. A & P further amended section 8 to provide that in the event of termination, "all of the funds of the Plan shall be used solely for the benefit of members and retired members or their contingent annuitants, and their widows...." 1973 Plan, Sec. 8(2), App. at 1110. The effect of the 1973 amendments was to eliminate the provision that excess funds would on termination or expiration be returned to A & P. No change was made in 1973, however, in the provision of section 10 reserving to A & P the right to amend the Plan "retroactively or otherwise." According to Melervey's affidavit, A & P management apparently believed that the reserved right to amend permitted A & P to control the disposition of the excess Plan funds until termination, but that the threat of termination--and thus of vesting the excess in the fund participants--would discourage covetous raiders. App. at 1063-67.
 
 
 4
 In 1976 the A & P management purported to amend and restate the Plan. Among the changes in the 1976 Plan is an amendment to section 8 providing that "after all the liabilities under the Plan have been satisfied, any property remaining in the trust fund as a result of erroneous actuarial computation shall be distributed by the Trustee to the Company." 1976 Plan, Sec. 8.5, App. at 1252. The intended effect of the 1976 amendment appears to have been to restore the situation existing prior to 1973 under which excess funds would, on termination, be returned to A & P.
 
 
 5
 Evidently there was some concern that the 1976 amendment may not have been effective in restoring the pre-1973 situation, however, for in 1981, in response to sections 4044(d)(1)(A) and (B) of ERISA, 29 U.S.C. Sec. 1344(d)(1)(A), (B) (1976 & Supp. V 1981), section 11 of the Amended and Restated Plan was further amended by the addition of the following provision:
 
 
 6
 11.4. Upon termination of the Plan, any residual assets of the Plan shall be distributed to the Company if--
 
 
 7
 (A) All liabilities of the Plan to Members and their beneficiaries have been satisfied; and
 
 
 8
 (B) The distribution does not contravene any provision of law.
 
 
 9
 App. at 109, 1061. The parties do not dispute that by June 26, 1981, when the language just quoted was adopted, the Plan, by its terms, purported to restore the pre-1973 provisions under which, on termination, excess funding would be restored to A & P.
 
 
 10
 By 1981 A & P's business fortunes had badly deteriorated. Between 1970 and 1979 A & P had reduced the number of its retail stores from 4500 to 1500 and the number of its employees from 130,000 to 63,000. App. at 1036. A & P accrued enormous losses in 1980 and 1981. An actuarial consulting firm suggested in April of 1981 that A & P terminate the Plan in order to recapture the Plan's excess funding. On October 16 A & P announced that it intended to terminate the plan. This litigation intervened.
 
 II. The Class Action and Settlement
 
 11
 On October 30, 1981 Walsh filed the instant class action. Charging that the 1981 amendment was a breach of fiduciary duties in violation of Sections 404 and 405 of ERISA, 29 U.S.C. Secs. 1104-1105 (1976 & Supp. V 1981), the complaint sought a declaratory judgment that the June 26, 1981 amendment to Section 11 is a nullity and an injunction against distribution of the excess funds to A & P. App. at 26. In January of 1982 the district court, on the stipulation of the parties, determined that the requirements of Fed.R.Civ.P. 23(a), (b)(1) and (b)(2) had been fully satisfied and that Walsh and his counsel would fairly represent and adequately protect the interests of the class. The district court's order certifying the class defined the class as all persons "who are members, including former members, and their covered beneficiaries" of the A & P Plan. The parties stipulated, and the court ordered, that notice be provided "to all members, including former members, of the Plan and their covered beneficiaries who are denominated as such on the books and records of the Plan." App. at 115. The court ordered notice by publication once in the Eastern Edition of the Wall Street Journal and once in the Newark Star Ledger, and by first class mail addressed to class members at the most recent address shown on the books and records of the Plan.
 
 
 12
 Thereafter, counsel for Walsh and for A & P engaged in substantial discovery and in settlement negotiations. In April of 1982 the parties reported a proposed settlement to the court. Under its terms A & P would amend the Plan so that $50 million of the excess funds would be used to purchase annuities which would increase retirement benefits. Of the $50 million, $40 million would be allocated among retired employees and terminated Plan participants who had vested pension rights. Ten million dollars would be allocated to participants still employed by A & P on the date of the Plan's termination. The remaining excess funds--then estimated at $200 million, and subsequently assessed at an even greater value because of favorable market performance--would revert to A & P. Attorneys' fees for the class representative's counsel would be determined by the court, but paid by A & P.
 
 
 13
 Counsel for the class requested from A & P additional actuarial information respecting the apportionment of the $50 million settlement between active and retired participants. After receiving this information, class counsel determined that an allocation of $40 million would provide no less than a 15 percent increase in benefits to retired participants, assuming no precipitous drop in long-term interest rates. App. at 522-27. When so informed, Mr. Walsh objected to the settlement. Class counsel nevertheless concluded that it was obliged to bring the proposed settlement to the attention of the court and to request notice to the class. App. at 529.
 
 
 14
 On May 24, 1982, class counsel and counsel for A & P presented a Stipulation of Settlement to the district court. On June 1, 1982, at a conference with the court, Mr. Walsh stated his objections to it. Without approving the proposed settlement, the district court ordered that notice of it be sent to the class and scheduled a hearing with respect to its fairness for July 9, 1982. App. at 166-70. The court also ordered the appointment of an independent actuarial consultant to advise on fairness of the settlement. Notice of the proposed settlement--published on June 7 and mailed on June 10 in the same manner as the prior notice of the class action--informed the class members of its terms, of Walsh's opposition to it, and of their right to appear and object at the July 9, 1982 hearing.
 
 
 15
 Because of disagreements between Walsh and counsel over the adequacy of the settlement, Walsh moved on June 2, 1982 to relieve class counsel. App. at 174-75. On June 9, 1979 the court denied that motion, finding that class counsel was acting consistently with their view of "that which is in the best interest of the class." App. at 427. Thereafter Walsh moved for the appointment of additional class counsel, or for the appointment of counsel to represent objecting class members, to be compensated by A & P. He also moved for postponement of the July 9, 1982 hearing in order to permit class members to engage counsel and to file objections to the settlement. See App. at 444-45. The court held a hearing on these motions on June 21, 1982. Noting that A & P had no obligation, at that stage of the lawsuit, to pay attorneys' fees to any class counsel, the court denied Walsh's motion for the appointment of counsel at A & P's expense. See App. at 458-62. The court informed Walsh, however, that he was free to retain counsel to represent him and like-minded class members. Id. In addition, the court granted Walsh's request for a postponement of the fairness hearing so that interested class members could, if they preferred, retain counsel and oppose the settlement. Thus a new fairness hearing was scheduled for September 21, 1982. A new notice, advising of the postponed date and clarifying certain aspects of the settlement, was published and mailed in the same manner as the two prior notices.
 
 
 16
 On September 21, 1982, the court held a hearing on fairness, reasonableness, and adequacy of the proposed settlement. Walsh, speaking without counsel, advanced the position that A & P's 1973 Plan amendments created a "liability" to Plan participants. App. at 485. Consequently, he reasoned, the reserved power of amendment, which excluded amendments which would return funds to the company "prior to the satisfaction of all liabilities" to members, did not permit the 1976 or 1981 amendments on which A & P relied. In Walsh's view all excess funds must therefore remain in the Plan for distribution to the members.
 
 
 17
 Counsel to A & P urged that Walsh was simply wrong about the 1973 Plan amendment. That amendment did not, counsel maintained, create a "liability" beyond the Plan's defined benefits. But in any event, he urged, even if Walsh were correct, A & P could not be compelled to terminate the Plan. The company had refrained from doing so when the lawsuit commenced, counsel argued, and could continue to refrain from doing so. At the same time A & P could simply cease making Plan contributions so that any excess funding would be expended by funding for present and future employees. App. at 500. On the other hand, counsel asserted, rejection of the settlement would prejudice class members. Many class members are elderly and could in their declining years receive some additional benefits, but might die before a litigated disposition became final. App. at 507.
 
 
 18
 Class counsel outlined the difficult legal issues presented by the case. Like counsel to A & P, class counsel expressed concern that even if the contention that the 1973 amendments created a liability were accepted, the ultimate outcome could be that the Plan would continue indefinitely, with no further contributions from A & P, and no benefit to class members. App. at 517-18.
 
 
 19
 Sixteen members of the class also addressed the court. Some were represented by counsel, although Walsh and most others who attended were not. A few expressed approval of the settlement. See App. at 563, 568-69. Most expressed the view that the plan participants were entitled to the entire fund. See App. at 541-42, 549-62, 594-600.
 
 
 20
 At the conclusion of the hearing the court directed counsel for A & P to submit memoranda addressing concerns voiced at the hearing. Walsh also made several new arguments in post-hearing submissions. First, Walsh contended for the first time that a number of A & P store closings constituted partial terminations, entitling some class members to some or all excess funds. Second, he urged that a 1978 merger of the A & P Plan with a union-administered plan at a bake shop in Terre Haute, Indiana, made the Plan subject to the non-divestiture clause of the Terre Haute Plan.
 
 
 21
 On February 9, 1983, the district court filed an opinion holding that the proposed settlement is fair, adequate, and reasonable. Walsh v. Great Atlantic & Pacific Tea Co., 96 F.R.D. 632 (D.N.J.1983). After the court's opinion was filed, Walsh for the first time advanced objections to the adequacy of the class notice. He contended (1) that the publication notice in two east-coast newspapers was inadequate; (2) that many mailed notices were returned; and (3) that a clearly defined "subclass" of former employees--those persons terminated due to store closings who may have vested rights if a partial Plan termination occurred--were excluded from the notice. In March of 1983 the court heard Walsh on these new objections. The district court declined to exclude the "subclass" of former employees from the judgment on March 7, 1983, App. at 638, and declined to require express notice to them of the settlement on March 11, 1983, App. at 657-58.
 
 
 22
 On March 18, 1983, the court entered judgment approving the settlement in the form to which the parties stipulated, with the exception of a provision intended to protect former employees who may have vested rights in the event of a partial termination. The modification provides that if the Internal Revenue Service should determine that a partial termination of the Plan has occurred, then the partial terminees shall be paid their accrued benefits plus increased benefits equivalent to those provided under the settlement to members of the class with comparable vested rights. Any such additional payments would be made by A & P from its own funds, and not from the $50 million settlement fund. This appeal followed.
 
 III. Walsh's Contentions
 
 23
 Walsh, now represented by counsel, advances several reasons for setting aside the order approving the settlement. We address them separately.
 
 A. Adequacy of Notice
 
 24
 The district court certified this class action under Fed.R.Civ.P. 23(b)(1) and (b)(2). See 96 F.R.D. at 638. The action was not certified under Rule 23(b)(3). Thus the stringent requirement of Rule 23(c)(2) that members of the class receive "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable efforts," Fed.R.Civ.P. 23(c)(2), is inapplicable. Rather, the only notices required by the Federal Rules are those provided for in Rules 23(d) and (e).
 
 
 25
 Rule 23(d) provides that the court may require that "notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action." Fed.R.Civ.P. 23(d)(2). As the Advisory Committee Notes to Rule 23 make plain, Rule 23(d)(2) "does not require notice at any stage, but rather calls attention to its availability and invokes the court's discretion." Fed.R.Civ.P. 23(d)(2) advisory committee note. Rule 23(e) addresses post-settlement notices and provides that "notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed.R.Civ.P. 23(e).
 
 
 26
 Thus, in Rule 23(b)(1) and (b)(2) class actions, Rule 23(d) provides that pre-settlement notice is entirely discretionary with the trial court. Rule 23(e) makes some form of post-settlement notice in Rule 23(b)(1) and (b)(2) class actions mandatory, although the form of notice is discretionary. The discretion appropriate to Rule 23(b)(1) and (b)(2) classes derives from the nature of the relief sought in these actions. Rule 23(b)(1) and (b)(2) classes are cohesive in nature. See Wetzel v. Liberty Mutual Casualty Co., 508 F.2d 239, 248-50 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); C. Wright & A. Miller, Federal Practice and Procedure Secs. 1777, 1786, at 44, 143 (1972). Because of this cohesiveness, an adequate class representative can, as a matter of due process, bind all absent class members by a judgment. See Hansberry v. Lee, 311 U.S. 32, 43, 61 S.Ct. 115, 118, 85 L.Ed. 22 (1940).[1] We are satisfied that the notices given in this action amply satisfied the demands of due process. The only question, therefore, was whether the form and scope of pre-settlement and post-settlement notice constituted an abuse of the district court's discretion.
 
 
 27
 Although Walsh's position with respect to notice is not entirely clear, we will assume for purposes of this appeal that he objects both to the pre-settlement (January, 1982) and the post-settlement (May and June, 1982) notices. As to the pre-settlement notice, the form of notice selected--publication in two newspapers and mail to class members whose names and addresses appear on the books and records of the Plan--was not an abuse of discretion. Assuming the class was adequately represented in the action for declaratory and injunctive relief,[2] such pre-settlement notice might have been dispensed with entirely. See United States v. Allegheny-Ludlum Industries, Inc., 517 F.2d 826, 875-79 (2d Cir.1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). The form of notice selected, considering the size and diverse location of the class, was more than adequate to guard against the sacrifice of interests of class members. Those interests, in this Rule 23(b)(1) and (b)(2) class action for declaratory and injunctive relief, were related primarily, if not exclusively, to adequacy of representation, since a judgment in the action would establish the obligations of A & P and the Plan to the entire class. Clearly it was not necessary to select a form of notice designed to reach every class member. Notice to a representative cross-section sufficed to assure that inadequacies in representation of the entire class or of subclasses would likely be called to the court's attention.[3]
 
 
 28
 What we have said about the discretionary pre-settlement notice is equally applicable to the mandatory post-settlement notice. Rule 23(e) mandates some form of notice of a proposed dismissal or compromise, but the form of notice of settlement of a Rule 23(b)(1) or (b)(2) class action need only be such as to bring the proposed settlement to the attention of representative class members who may alert the court to inadequacies in representation, or conflicts in interest among subclasses, which might bear upon the fairness of the settlement. The form of notice selected here--publication and mail--was clearly adequate even if, as Walsh urges, some class members would be unlikely to see either the Wall Street Journal or the Newark Star Ledger, and even if the names of some class members may not have appeared on the records of the Plan. The fact that the missing names and addresses might have been obtained from a computer search of A & P records is for this Rule 23(b)(1) and (b)(2) case irrelevant. Walsh's vigorous objection to the settlement, and that of the other objectors, demonstrates that the notice selected was adequate, considering the interests involved.
 
 
 29
 One final objection to the notice of settlement advanced by Walsh is that no notice was given to a "subclass" of former employees, discharged due to store closings, who may have vested rights if the store closings amounted to partial terminations of the Plan. As noted above, the existence of this subclass was never suggested until after the court filed an opinion approving the settlement. The judgment protects the interests of members of that subclass. It does not adjudicate the issue of partial terminations, but does direct that if the Internal Revenue Service should determine that partial terminations have occurred, then the discharged employees will receive the same benefits as are payable to previously identified class members. Because the unidentified former employees are assured by the judgment of being no worse off than the identified class members, should they ultimately establish the speculative claim that store closings amounted to partial terminations, the court did not commit an abuse of discretion in approving the settlement without providing for separate notice to them.
 
 B. Failure to Provide for New Counsel
 1. Failure to Discharge Class Counsel
 
 30
 Walsh contends that the trial court abused its discretion by failing to discharge class counsel. That contention is predicated upon a supposed conflict in interests between former and current A & P employees. We find no merit in this contention. On liability issues the interests of the present and former employees with respect to the Plan's excess funds are identical. The only possible divergence of interests is in the manner in which the settlement fund would be shared. Such disagreements over the proper division of a settlement fund do not necessarily create conflicts of interest requiring separate representation. See Developments in the Law--Class Actions, 89 Harv.L.Rev. 1318, 1553-60 (1976). Such a rule would place substantial burdens on the settlement process. The court's principal obligation is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund. The proposed settlement in the instant case divides the settlement fund in the ratio of current to former employees, and no suggestion has been advanced that any other method of division would be fairer to either group.
 
 
 31
 Walsh also contends that the court erred in concluding that counsel adequately represented both objecting and unobjecting class members. This contention is also meritless. Class counsel's duty to the class as a whole frequently diverges from the opinion of either the named plaintiff or other objectors. See Parker v. Anderson, 667 F.2d 1204, 1210-11 (5th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982); Kincade v. General Tire & Rubber Co., 635 F.2d 501, 508 (5th Cir.1981). The court was required to and did consider whether class counsel provided fair and adequate representation to the class as a whole. There was no abuse of discretion in refusing to remove class counsel.
 
 
 32
 2. Failure to Appoint Class Counsel for the Objectors
 
 
 33
 Walsh also urges that the court abused its discretion when it refused to appoint class counsel for the objectors at A & P's expense. The court made it perfectly clear that Walsh or any other objector could retain separate counsel. There is no authority to appoint counsel at the opposing party's expense prior to any determination of liability. See Mandujano v. Basic Vegetable Products, Inc., 541 F.2d 832, 835 n. 6 (9th Cir.1976). Thus the court did not abuse its discretion in denying Walsh's motion.
 
 
 34
 C. The Adequacy of the Hearing on Settlement
 
 
 35
 Walsh contends that the September 21, 1982 hearing on the settlement violated the due process rights of the objecting class members by denying them a realistic and meaningful opportunity to develop a record of their objections. The court commenced the hearing by inviting Walsh to state his objections to the settlement, and he did so at considerable length. He now urges that the court should have taken testimony and permitted cross-examination of witnesses. There might have been some merit to that contention had he or any other objector sought the opportunity to introduce evidence or to cross-examine anyone. See Greenfield v. Villager Industries, Inc., 483 F.2d 824, 833 (3d Cir.1973). Indeed, the manner in which the trial court conducted all proceedings relating to the settlement suggests that had such an opportunity been requested, it would have been afforded. A failure to request such an opportunity must in the circumstances be deemed a waiver. See Kohn v. American Metal Climax, Inc., 489 F.2d 262, 264 (3d Cir.1973) (per curiam). Moreover, because the facts are largely undisputed, and the fairness of the settlement depends primarily upon an evaluation of the competing legal positions of the parties, it is difficult to imagine what value an evidentiary hearing would, in this case, have had. Walsh's brief on appeal does not enlighten in this respect. The district court evaluated the legal contentions of all parties and provided objectors with a full and fair opportunity to expose their positions. No more was required. See Girsh v. Jepson, 521 F.2d 153, 160 (3d Cir.1975).
 
 D. The Fairness Determination
 
 36
 Finally, on the merits, Walsh contends that we should reverse the trial court's approval of the settlement. The standard which a district court must apply in approving a class action settlement is whether the settlement is fair, adequate, and reasonable. See Shlensky v. Dorsey, 574 F.2d 131, 147 (3d Cir.1978); Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir.1975); Bryan v. Pittsburgh Plate Glass Co., 494 F.2d 799, 801 (3d Cir.), cert. denied, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974). We review the district court's application of that standard only for abuse of discretion. Shlensky, 574 F.2d at 147; Girsh, 521 F.2d 156 & n. 7; Bryan, 494 F.2d at 801. Moreover, in our review of the exercise of discretion in approving settlements,
 
 
 37
 [g]reat weight is accorded [the] views [of the trial judge] because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly.
 
 
 38
 Ace Heating & Plumbing Co. v. Crane Co., 453 F.2d 30, 34 (3d Cir.1971).
 
 
 39
 The most important factor in making that determination in this case is the likelihood that the class plaintiffs could at final hearing have established two legal propositions: (1) that the 1973 Plan amendment created a "liability" to class members within the meaning of section 10, governing Plan amendments; and (2) assuming the first proposition were established, that A & P could be forced to terminate the Plan rather than letting it continue without further funding. A & P advanced a strong argument that the proposed distribution of surplus assets in the 1973 amendment did not create a liability for benefits, and that the amendment clause referred only to such liabilities.[4] It advanced perhaps a stronger argument that if the company lost on the first proposition, A & P could merely let the Plan stand, without further funding, and thereby gradually eliminate the excess funding. If either argument were to prevail, no class member would receive any benefit from the Plan's surplus funds. Class counsel expressed particular concern about the likelihood of success on the second proposition.
 
 
 40
 Walsh, in opposition to the settlement, relied principally on Audio Fidelity Corp. v. Pension Benefit Guaranty Corp., 624 F.2d 513 (4th Cir.1980). In Audio Fidelity, a deferred benefits retirement plan provided, as did section 8 of the 1973 A & P Plan, that excess assets would be distributed to participants and their beneficiaries upon termination. 624 F.2d at 515-16. The employer terminated the plan before purporting to amend it so as to divert surplus funds to the company. Reasoning that the plan fixed the rights of the participants upon termination, the Audio Fidelity court held that a post-termination attempt to divert surplus was prohibited by ERISA. 624 F.2d at 517. The Audio Fidelity court distinguished a pre-termination amendment such as was held to be effective in transferring surplus in In re C.D. Moyer C. Trust Fund, 441 F.Supp. 1128 (E.D.Pa.1977), aff'd mem., 582 F.2d 1273 (3d Cir.1978).
 
 
 41
 The district court concluded that because A & P's 1976 and 1981 amendments were made prior to termination of its Plan, neither the Audio Fidelity opinion nor the statutes on which the opinion relied lent support to the objectors' position. We conclude that this evaluation of the authorities referred to was reasonable. Audio Fidelity simply illustrated the proposition that a provision equivalent to A & P section 8 prohibited a post-termination diversion of surplus. The parties here concede that section 8 would have prohibited such a post-termination diversion. Walsh instead argues that section 8 created a pre-termination liability which, under section 10, could not be diverted to the company. The Audio Fidelity plan evidently contained no analog to A & P section 10, nor was one necessary to that court's decision.
 
 
 42
 For these reasons, the legal risks associated with Walsh's position were substantial. In light of the legal risks involved, and mindful of the deferential scope of review referred to above, we cannot say that the trial court abused its discretion in determining that the settlement was fair, adequate and reasonable. The district court's opinion also discussed other issues raised by Walsh, including the complexity of the litigation, the effect of the Plan booklet on plaintiff's case, the stage of the proceedings and the amount of discovery completed, and the reaction of the class to the settlement. We are satisfied with the district court's treatment of them.
 
 IV. Conclusion
 
 43
 The judgment approving the settlement will be affirmed.
 
 
 44
 GARTH, Circuit Judge, concurring in the result:
 
 
 45
 I am in complete agreement with the result reached by the majority opinion, which affirms Judge Lacey's judgment and excellent opinion. I write separately because of one concern which was not adequately addressed in the majority opinion, and because of another concern which was addressed by the majority, but which should not have been.
 
 
 46
 On the one hand, the majority opinion fails to acknowledge this Court's teaching, as that teaching has appeared in various opinions of this Court, and particularly in Girsh v. Jepson, 521 F.2d 153 (3d Cir.1975), with respect to settlement of actions such as this one. Indeed, the factors which we have specified as appropriate for consideration in such cases, and which the district court properly took into account in its approval of the settlement, have not been outlined or even mentioned in detail in the majority opinion. In Girsh, this Court enumerated the factors to be considered in approving a settlement of a class action: (1) the complexity, expense, and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceeding and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation, including the likelihood of success on the merits. See Girsh, 521 F.2d at 157. I believe that these factors should be stressed, and that we should recognize, in our approval of the district court's actions, the fact that Judge Lacey, the district court judge, not only followed our instructions, but conformed in every respect to our precedential requirements. Indeed, an examination of the record reveals that Judge Lacey considered each of the Girsh factors in exhaustive detail, and applied the facts of this case to the settlement standards of this Court. See Walsh v. Great Atlantic & Pacific Tea Co., 96 F.R.D. 632 (D.N.J.1983). It is for this reason that I am in agreement that the judgment should be affirmed.
 
 
 47
 In another aspect, the majority opinion discusses matters which I believe were not raised on this appeal and which are unnecessary to the disposition of this case. Walsh claimed that the procedures used in giving notice to the members of the class concerning the settlement were constitutionally deficient under the due process clause. The majority opinion refers to this argument in only one sentence, in which it holds that "We are satisfied that the notices given in this action amply satisfied the demands of due process." Maj. op., typescript at 16. I am in complete accord with this holding.
 
 
 48
 The majority goes on, however, to discuss the various subsections of Fed.R.Civ.P. 23, and the arguably different standards of notice which each might require. This discussion of Rule 23, however, was never raised by the plaintiff Walsh, who instead relied solely on the due process clause as the basis for his contention that the notice procedures were inadequate. Having already found that due process was satisfied--a conclusion with which I agree and in which I join--the majority opinion nevertheless has launched into a gratuitous discussion of the possibly different results which might have obtained under Rule 23. I find no reason to address such an alternative argument which might have been raised, but which in fact was never raised, by Walsh. Accordingly, I do not join in so much of the majority opinion that relies upon an analysis of Fed.R.Civ.P. 23 to support its holding. It is sufficient for me to recognize that in this case, due process was not violated.
 
 
 49
 In all other respects, I believe that the judgment should be affirmed substantially for the reasons expressed in Judge Lacey's opinion for the district court, and I concur in the majority's result which affirms that judgment.
 
 
 
 [1]
 Rule 23(b)(3) classes are less cohesive, and must abide by more stringent due process constraints. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173-74, 94 S.Ct. 2140, 2150, 40 L.Ed.2d 732 (1974); Greenfield v. Villager Indus., Inc., 483 F.2d 824, 833-34 (3d Cir.1973)
 
 
 [2]
 In Part III B, infra, we hold that the class was adequately represented
 
 
 [3]
 Fed.R.Civ.P. 23(c)(2) affords the right to opt out of a Rule 23(b)(3) class and requires notice informing class members of this option. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173, 94 S.Ct. 2140, 2150, 40 L.Ed.2d 732 (1974); Girsh v. Jepson, 521 F.2d 153, 158-59 (3d Cir.1975). There is no similar opt-out right for Rule 23(b)(1) and (b)(2) classes. Wetzel v. Liberty Mutual Ins. Co., 508 F.2d 239, 248-49, 252-53 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); see Laskey v. International Union, United Automotive, Aerospace and Agricultural Implement Workers, 638 F.2d 954, 956 (6th Cir.1981); cf. Plummer v. Chemical Bank, 668 F.2d 654, 657 & n. 2 (2d Cir.1982) (suggesting without holding that opt-out is permissible only in Rule 23(b)(3) cases). Notice for the purpose of informing class members of an opt-out right is therefore unnecessary in Rule 23(b)(1) and (b)(2) class actions. But see Penson v. Terminal Transport Co., 634 F.2d 989, 993 (5th Cir.1981) (district court has discretion to permit Rule 23(b)(2) opt-out)
 
 
 [4]
 A natural reading of the Plan provisions suggests that section 8 of the Plan did not create pre-termination liabilities. Accordingly, section 10--which prohibited encroachments on pre-termination liabilities--apparently did not prohibit amendments to the section 8 rules for distributing surplus. Even section 8 distinguished between accrued benefits--which were nonforfeitable--and surplus assets--which were to be paid to participants after all nonforfeitable accrued liabilities were satisfied. Internal Revenue Service regulations do not define such surplus assets as "contingent liabilities." See 26 C.F.R. Sec. 1.401-2(b)(2) (1983). We need not adjudicate the merits of this issue, however. It suffices to observe that A & P pressed strong arguments for its position that the 1973 amendment to section 8 did not create a "liability" within the meaning of section 10