FISHER BROTHERS, INC. and Goldberg Plumbing Supply Company, Inc., Individually and as Representatives of a Class, Plaintiffs,

v.

MUELLER BRASS COMPANY, Defendant.

Civ. A. No. 84–0413.

United States District Court, E.D. Pennsylvania.

Oct. 2, 1985.

Seymour Kurland and Burt M. Rublin, Wolf, Block, Schorr & Solis-Cohen, Leonard Barrack, Barrack, Rodos & Bacine, Warren Rubin, Gross & Sklar, Philadelphia, Pa., for plaintiffs.

Barry Wm. Levine, Dickstein, Shapiro & Morin, Washington, D.C., for defendant.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

Plaintiffs brought this action individually and on behalf of a class of direct purchasers of copper water tubing for damages allegedly sustained from the participation of defendant Mueller Brass Company ("Mueller") in a price-fixing conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Mueller entered into an Agreement of Settlement with plaintiffs on April 5, 1985, and the court preliminarily approved this settlement on May 17, 1985. Upon due notice to members of the proposed settlement class, the court held a hearing on plaintiffs' motion to approve this proposed settlement pursuant to Federal Rule of Civil Procedure 23(e) on September 9, 1985. No class members objected or asked to be heard. Upon full consideration of written submissions and oral arguments in support of the settlement, the court now approves the settlement as fair, reasonable and adequate.

## FACTS AND PROCEDURAL HISTORY

Although the civil action against Mueller was not filed until January 20, 1984, its genesis lies in a series of criminal and civil proceedings during several preceding years. A federal grand jury in the Eastern District of Pennsylvania began investigating alleged price-fixing in the copper water tubing industry in the summer of 1981.

On November 5, 1982, while the investigation was in progress, plaintiff Fisher Brothers filed a civil complaint against Cambridge-Lee Industries, Inc. ("Cambridge-Lee"), Cerro Copper Products, Inc. ("Cerro"), Halstead Industries, Inc. ("Halstead"), and Howell Metal Company, Inc. ("Howell") (Civil Action No. 82–4921), that alleged defendants and other co-conspirators had engaged in an unlawful conspiracy to fix, raise, maintain or stabilize the price of copper water tubing. Plaintiff also moved to certify the action as a class action on behalf of a putative class of direct purchasers of copper water tubing.[1]

On March 18, 1983, the grand jury returned an indictment against six corporate defendants, Cambridge-Lee, Cerro, Phelps Dodge Industries, Inc. ("Phelps Dodge"), Reading, Revere Copper and Brass, Inc. and Revere Copper Products, Inc. (together known as the "Revere Companies") and six present or former employees of some of these companies. The indictment alleged that the corporate and individual defendants had engaged in an unlawful conspiracy to fix the price of copper water tubing from at least 1975 until June, 1981.[2] Mueller was not indicted, but the company and four of its former officers and employees were named as unindicted co-conspirators in the Government's Voluntary Bill of Particulars.[3]

A nine-week criminal trial was held before The Honorable Daniel H. Huyett, 3rd, and on December 22, 1983 the jury found all defendants who went to trial not guilty.[4]

Plaintiffs then filed this action against defendant Mueller on behalf of a putative class of direct purchasers of copper water tubing. The complaint alleged that Mueller unlawfully conspired with certain named and un-named co-conspirators to raise, fix, maintain and stabilize the prices and terms and conditions of sale of copper water tubing in violation of the antitrust laws. For pretrial purposes only, this court coordinated C.A. 84–413 with the other civil cases arising out of this alleged conspiracy. (See Pretrial Order No. 1 in C.A. 84–4921 (the "Master File case"), mailed to counsel for Mueller on February 23, 1984).

On July 6, 1984, the court granted plaintiffs' motion to certify a class defined as:

All individuals, proprietorships, partnerships, corporations and other business entities in the United States (excluding defendant, its subsidiaries and affiliates, and its co-conspirators) who have, during the time period January 1, 1975 through November 30, 1982 purchased copper water tubing directly from one or more of the defendant (including defendant's subsidiaries and affiliates) or its co-conspirators. The term 'copper water tubing' does not include copper tubing manufactured to customer specification, which is sold primarily to original equipment manufacturers and is known in the industry as 'industrial tubing.'

(Memorandum and Order of July 26, 1984).

Plaintiffs and Mueller conducted extensive discovery; thousands of documents were exchanged; many interrogatories

---

**1.** On April 29, 1983, the court approved a stipulation certifying the class consisting of business entities who directly purchased copper water tubing from defendants or their alleged co-conspirators during 1975–November, 1982. See Pretrial Order No. 5.

**2.** In May, 1983, plaintiffs individually and on behalf of a putative class of direct purchasers of copper water tubing brought an action against Phelps Dodge (C.A. No. 83–2457). The suit against the Revere Companies was delayed because the companies were in bankruptcy proceedings in the Bankruptcy Court for the Southern District of New York, but on October 19, 1984, the Bankruptcy Court approved a stipula-

tion allowing an action (C.A. 84–5106) solely for the purpose of effectuating the settlement included in the stipulation. Reading was in bankruptcy proceedings in the Bankruptcy Court for the Eastern District of Pennsylvania; Reading had no assets with which to respond to a judgment, so plaintiffs could not pursue any claims against Reading in this litigation.

**3.** Plaintiffs' Reply Brief in Support of their Motion for Class Certification (C.A. No. 84–413), p. 4.

**4.** Prior to the criminal trial, Reading and the Revere Companies entered pleas of *nolo contendere* and were sentenced accordingly.

were answered; and numerous depositions were taken. Plaintiffs and Mueller also sought the court's assistance in resolving numerous discovery disputes. Intermittently, counsel for plaintiffs and counsel for Mueller engaged in settlement negotiations.

By the end of 1984, plaintiffs had entered into settlement agreements with defendants Phelps Dodge, Howell, Halstead and the Revere Companies. After intensive negotiations, settlements were achieved with remaining defendants Cambridge-Lee (January 10, 1985), Cerro (February 7, 1985), and, finally, Mueller (April 5, 1985).

The Agreement of Settlement with Mueller provided that Mueller would pay $500,000 in six installments of $83,333.33 each, with interest on the outstanding balance at the prime rate, with the final payment to be made on or before July 1, 1987. The Agreement was executed on behalf of a settlement class defined as the plaintiff class in this litigation, except that the settlement class was defined as those who purchased copper water tubing directly from "Mueller (including its subsidiaries and affiliates) or its alleged co-conspirators," while the plaintiff class definition referred instead to "defendant (including defendant's subsidiaries and affiliates) or its co-conspirators."

The court held a hearing on plaintiffs' motion for preliminary approval of the settlement on April 18, 1985. The court preliminarily approved this settlement on May 17, 1985 and directed that notice of the proposed settlement be sent to the settlement class and published twice in all regional editions of *The Wall Street Journal.* Pursuant to the court's Order, counsel for the class sent notice to all class members that a court hearing to determine whether the proposed Mueller settlement [5] was fair, reasonable and adequate would be held on September 9, 1985. The notice also stated that any member of the class could appear and be heard at the hearing to object to the

proposed settlement. Proof of mailing and publication of the notice was filed with the court on June 26, 1985 and supplemented by a status report on notices filed with the court on September 4, 1985. The September 9, 1985 hearing was held as scheduled.

The court, having considered the oral submissions of September 9, 1985 and the prior filings and record of this case, now determines upon an independent evaluation of the proposed Mueller settlement that it is fair, reasonable and adequate.

## JURISDICTION TO APPROVE SETTLEMENT

At the September 9, 1985 hearing on approval of the Cambridge-Lee, Cerro and Mueller settlements the court ruled that the notice of appeal filed by Phelps Dodge on August 26, 1985 in *Fisher Brothers, et al. v. Phelps Dodge, Inc.* (Civil Action No. 83–2457) did not divest the court of jurisdiction to approve the Cambridqe-Lee and Cerro settlements (Civil Action No. 82–4921) or the Mueller settlement (Civil Action No. 84–413). In its appeal, Phelps Dodge seeks to overturn this court's ruling of July 26, 1985 that the Cerro settlement did not violate the most favored nations clause of the Phelps Dodge settlement approved by this court on February 20, 1985. This determination was made before scheduling the September 9, 1985 hearing to determine whether the Cambridge-Lee, Cerro and Mueller settlements should be approved pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. The Phelps Dodge appeal was taken after that hearing was scheduled.

> As a general rule, the timely filing of a notice of appeal is an event of jurisdictional significance immediately conferring jurisdiction on a court of appeals and divesting a district court of its control over those aspects of the case involved in the appeal.

*Venen v. Sweet,* 758 F.2d 117, 120 (3d Cir.1985).

---

5. This notice also informed class members of proposed settlements with Cerro and Cam-

bridge-Lee.

■ The appeal of Phelps Dodge, filed August 26, 1985 in Civil Action No. 83–2457, divested the district court of power to act further in regard to that case. It would particularly preclude an order approving distribution of the Phelps Dodge settlement fund even if distribution were not precluded by the terms of the settlement agreement itself. However, the joint class action against Phelps Dodge is separate from the class actions against Cambridge-Lee and Cerro which were consolidated in Civil Action No. 82–4921, the so-called Master File case. Like the action against Mueller, the Phelps Dodge case, while coordinated for discovery was never consolidated for trial or any other purpose. Phelps Dodge unlike the Master File claimants (but like Mueller), agreed to class certification for settlement purposes only; in other respects the Phelps Dodge action has been treated as separate and independent from the Master File cases and the Mueller case. Indeed, the very memorandum opinion from which the Phelps Dodge appeal was taken was filed in Civil Action No. 83–2457 only. Therefore, the pendency of the Phelps Dodge appeal does not divest the court of jurisdiction to approve the Cambridge-Lee, Cerro and Mueller settlements.

## APPROVAL OF SETTLEMENT

■ Rule 23(e) of the Federal Rules of Civil Procedure mandates court approval of a class action settlement:

> A class action shall not be dismissed or compromised without the approval of the Court, and notice of the proposed dismissal or compromise shall be given to all members of the class....

Approval of a proposed class action settlement is discretionary with the court. *Girsch v. Jepson*, 521 F.2d 153, 156 (3d Cir.1975); *Ace Heating & Plumbing Company v. Crane Company*, 453 F.2d 30, 34 (3d Cir.1971). Settlement is a course favored by law, *Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc.*, 455 F.2d 770, 773 (2d Cir.1972), but a settlement will be approved only if it is "fair, adequate, and reasonable" to the members of the class, *Walsh v. Great Atlantic and Pacific Tea Company, Inc.*, 726 F.2d 956, 965 (3d Cir.1983). The settlement must be both substantively reasonable compared to the likely rewards of litigation, *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir.1978), and the result of good faith, arms length negotiations, *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir.1982).

Various courts have attempted to specify factors to be considered prior to decision upon the fair, reasonable, and adequate nature of a proposed class action settlement. *See Malchman v. Davis*, 706 F.2d 426, 433–34 (2d Cir.1983) (nine factors); *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir.1983) (six factors); *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th Cir.1982), *cert. denied*, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983) (eight factors). In *Girsch v. Jepson*, 521 F.2d 153 (3d Cir. 1975), this Circuit noted the relevancy of the following nine factors in determining the fairness of a settlement:

> ... (1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation....

*Girsch*, 561 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974)).

## A. Uncertainties of Litigation

This settlement was achieved after discovery was virtually completed [6] and after settlement of all other coordinated cases alleging conspiracy in the copper water tubing industry from 1975 through November, 1982. With the exception of actual trial preparation (though this would be extensive), this settlement did not avoid a great deal of discovery.

However, a settlement allows the class to avoid many risks it would face in continuing to litigate against this defendant. Mueller and its present and former employees were not indicted in the criminal case, so plaintiff class faced the risk of jury skepticism of a major case against a relatively minor, unindicted member of the alleged conspiracy. Of course, the fact that the defendants indicted were acquitted might have an unintended adverse affect on a jury notwithstanding its irrelevance to this civil litigation.

The court had not yet decided Mueller's motion *in limine* to prohibit plaintiffs from introducing in evidence the criminal trial testimony of certain witnesses whose testimony allegedly implicated Mueller. These witnesses had all invoked the Fifth Amendment at their depositions and were all beyond the subpoena power of the court, so without the criminal trial transcripts the case against Mueller would proceed without their testimony. Mueller argued this testimony was inadmissible against it because it was not a party to the criminal case and Mueller had never had the opportunity to test the testimony of these witnesses' by cross-examination. Concern that the court might decide this motion in

Mueller's favor should have contributed to plaintiffs' willingness to settle.[7]

In spite of all of this, Mueller also had reason to avoid the uncertainties of litigation. Plaintiffs would have introduced as evidence against Mueller the criminal trial testimony of Charles Treend, Mueller's Western Regional Manager from 1974–1980 and Cerro's Western Regional Manager from 1980–82.[8] This testimony supported Treend's contact with his counterparts at competitor firms and numerous discussions of whether Mueller prices would follow those of the industry leader. (*United States v. Cambridge-Lee Industries, Inc., et al.,* Criminal No. 83–00107, Trial Transcript, Day 8, November 7, 1983). Counsel for Mueller has asserted that Treend's deposition testimony fully explained the lawful nature of this activity; plaintiffs contend that they did not ask Treend many potentially incriminating questions at his deposition in order to rely on his testimony at the criminal trial. Evidence from the criminal transcripts and certain documents provided confidentially to the court as "[Confidential] Exhibits to Plaintiff's Reply Memorandum in Support of their Motion for Class Certification," convinced the court there was sufficient evidence against Mueller for this case to reach a jury even though Mueller did and does vigorously assert its lack of liability.

But as the only remaining defendant, Mueller would run the risk of being held joint and severally liable for *all* of the damages caused by reason of the alleged conspiracy.[9] The risk that as a losing defendant it faces treble damages also enters into a defendant's decision to avoid the risks of litigation. Finally, Mueller's coun-

---

6. At the time of settlement, there were several motions still pending, including a motion of Mueller to interview and take discovery from selected absent class members.

7. There is no constitutional right to confront witnesses in a civil case so the same standard would not apply here as in a criminal case.

8. Treend was available for deposition, so he was not an unavailable witness. But his criminal testimony would not have been barred by the hearsay rules to the extent that his testimony

was an admission of a party-opponent. Fed.R. Evid. 801(d)(2).

9. Before all other defendants had settled out of the case, Mueller ran the risk that the court would consolidate the case against Mueller with the other cases involving this conspiracy and coordinated for further pretrial purposes. Then Mueller would have had to defend itself at the same trial as, for example, Cerro, the industry leader.

sel fees for trial of a complex antitrust action would be substantial; while perhaps not as much as the $500,000 to be paid in settlement, the settlement eliminates the risk that not only would substantial counsel fees be paid but substantial damages as well.

## B. Negotiation Process

Though the court must independently evaluate the proposed settlement, the professional judgment of counsel involved in the litigation is entitled to significant weight. *See Jamison v. Butcher & Sherrerd*, 68 F.R.D. 479 (E.D.Pa.1975). The decision to settle on negotiated terms was made by highly experienced counsel who are especially competent with regard to class action litigation. Seymour Kurland, Esquire, Leonard Barrack, Esquire and associated counsel have successfully litigated numerous class actions. They were personally involved with all aspects of the settlement negotiations and their decision to accept this settlement agreement was made after a thorough evaluation of all relevant factors, including the competence, experience and tenacity of opposing counsel.

Settlement with Mueller was achieved only after all other defendants in the related cases had settled. Mueller settled at the last moment it was still possible for its settlement be included in the notice describing the Cerro and Cambridge-Lee settlements.

Counsel were also engaged in contesting numerous motions. These included such unusual filings as "Defendant's Motion to Strike Plaintiffs' Pretrial Memorandum" and "Defendant's Motion for Reconsideration of Mueller's Motion for Disqualification of Certain Plaintiffs' Counsel"; each party's attorney sought to have the court impose sanctions on the other for vexatious litigation and "libelous" statements. Eventually, the court was forced to preclude the parties from filing any further motions. (Pretrial Order No. 54).

The negotiations were also protracted, vigorous and, at times, unpleasant. Because of difficulties between counsel for Mueller and counsel for the class, the court took an active role in settlement discussions and, on several occasions, met separately with plaintiffs' and Mueller's counsel. On one occasion, the court met with principals of Mueller in an effort to resolve the litigation. In light of the intense zeal with which the attorneys each sought to promote their client's best interests, the court is confident that the Mueller settlement is in the best interest of the class.

## C. Reaction of the Class

When notices of this antitrust litigation and of the Halstead, Howell, Phelps Dodge and Revere settlements were mailed to 37,-000 recorded addresses of members of the stipulated settlement class and twice published in *The Wall Street Journal*, only 46 entities, or .13% of the class, opted to exclude themselves from the class. (Even though a substantial portion of these addresses were duplicative, the number of entities opting out is still exceedingly small.) A second notice informing class members of the Mueller, Cambridge-Lee and Cerro settlements was also mailed to the stipulated class; at this time, members of the class could no longer exclude themselves from the class so non-exclusion cannot be used as an indicia of non-objection.

But it is extremely relevant that no member of the class has raised any objection to the proposed settlement.' "[T]his unanimous approval of the proposed settlements by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlements." *In re Art Materials Antitrust Litigation*, 100 F.R.D. 367, 382 (N.D.Ohio 1983). Additionally, approximately 1,890 class members filed claim forms. This demonstrates considerable satisfaction with the results of this litigation. *See* discussion of percentage claims filed in *Zimmer Paper Products, Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 92–93 (3d Cir.1985).

## D. Amount of the Settlement

The court must review a settlement to determine whether it falls within a "range of reasonableness," not whether it is the

most favorable possible result of litigation. *See Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom., Benson v. Newman*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972) ("in any case there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion"). Because of these inherent risks of litigation, "the vast majority of courts which have approved settlements in [antitrust class actions] ... have given their approval to settlements which are traditionally based on an estimate of single [rather than treble] damages," *City of Detroit v. Grinnell Corp.*, 495 F.2d at 458.

Mueller's half-million dollar settlement represented approximately .2% of sales of $240 million during 1979–82. Mueller's .2% ratio of settlement to sales is low compared with Phelps Dodge's 2.4% settlement ratio, but comparable to Cerro's .88% ratio, Revere's .65% ratio, Cambridge-Lee's .3% ratio, Howell's .2% ratio, and Halstead's .1% ratio. The amount of Mueller's settlement is reasonable in light of Mueller's status in this case as well as its financial condition. Mueller was not indicted by the grand jury and has vigorously asserted confidence it would be vindicated at trial.[10] The court does not know how a jury would perceive Mueller's alleged culpability but Mueller's status as the last to settle may have helped persuade plaintiffs to accept this settlement ratio.[11]

A crucial factor in persuading plaintiffs to accept the $500,000 settlement with payment over time was Mueller's weak financial status.[12] Mueller is a wholly-owned subsidiary of Sharon Steel Corporation; Sharon Steel also owns 42.5% of Evans Products Co., and financier Victor Posner and his associated entities control a substantial portion of these companies.[13] *The Wall Street Journal* has reported that Sharon Steel Co. is "floundering" and that Evans Products Co. sought protection from creditors under Chapter 11 of the Federal Bankruptcy Code. *The Wall Street Journal*, April 17, 1985 at p. 1. Because Mueller's financial security would presumably be threatened by these events,[14] plaintiffs' counsel could reasonably agree to a settlement providing for six payments at the prime interest rate over a twenty-seven month period.[15]

### CONCLUSION

For the foregoing reasons, the court finds that the Mueller settlement provides the class members with the assurance of a substantial benefit which, when weighed against the costly and uncertain prospect of obtaining judgment at trial, is clearly in the interest of the class as a whole. The court approves this settlement as fair, reasonable and adequate.

### JUDGMENT ORDER

AND NOW, this 2nd day of October, 1985, for the reasons stated in the foregoing Memorandum, the court finds that:

**10.** Howell and Halstead were also unindicted.

**11.** The largest settlement in this case, $2.5 million with Phelps Dodge, was entered into in August, 1983, five months before the lawsuit against Mueller was filed.

**12.** When Mueller's financial status was first discussed at settlement negotiations in January, 1985, these matters were considered confidential. However, problems in Victor Posner's financial empire have recently been the subject of substantial public attention. *See, e.g.*, "The Lucrative Agony of Victor Posner," *Fortune*, April 8, 1985 (cover story); *The Wall Street Journal*, April 17, 1985, at p. 1.

**13.** Posner and his holding company own 38.8% of NVF Co., a publicly held company. NVF Co. owns 86% of Sharon Steel, which owns 100% of Mueller and 42.5% of Evans Products Co. *See The Wall Street Journal*, April 17, 1985 at p. 26.

**14.** Mueller's counsel reported that Mueller's financial status is recorded on a consolidated balance sheet with Sharon Steel.

**15.** The delay in distribution to the class was not a bar to the settlement since plaintiffs had settled on similar payout terms with the financially insecure Cambridge-Lee. *See* Memorandum and Order dated October 2, 1985.

1. The terms of the Agreement of Settlement with defendant Mueller Brass Company are fair, reasonable, and adequate to the class.

2. All class members have been served with notice of the proposed Agreement of Settlement and the hearing thereon, either directly or by publication in accordance with the court's order of May 17, 1985 directing same.

3. Notice by mail and publication was the best practicable in the circumstances.

THEREFORE, it is ORDERED that:

1. This settlement is approved on behalf of the following class, except all members who have previously excluded themselves and are listed in Exhibit A:

All individuals, proprietorships, partnerships, corporations and other business entities in the United States (excluding defendant, its subsidiaries and affiliates, and its co-conspirators) who have, during the time period January 1, 1975 through November 30, 1982 purchased copper water tubing directly from one or more of the defendant (including defendant's subsidiaries and affiliates) or its co-conspirators. The term 'copper water tubing does not include copper tubing manufactured to customer specification, which is sold primarily to original equipment manufacturers and is known in the industry as 'industrial tubing.'

2. Each plaintiff and member of the class who did not timely exclude itself is deemed to have agreed forever to refrain from proceeding against defendant Mueller Brass Company, its successors, assigns, affiliates, subsidiaries and predecessors, and any and all of its present and former directors, employees and agents, on any claims and causes of action which have been, might have been, are now or could be asserted in this action, and which are based upon allegations of collusion, combination or conspiracy or other conduct which might have been asserted under the federal antitrust laws with respect to the sale of copper water tubing during the period January 1, 1975 to November 30, 1982.

3. Without affecting the finality of this judgment in any way, this court reserves jurisdiction over the implementation of this settlement, including approving a final plan of distribution, resolving disputed claims by any class member, and awarding attorneys' fees and any additional expenses.

4. In accordance with the court's findings herein, the Clerk of the Court is directed to enter final judgment pursuant to Fed. R.Civ.P. 54(b).

### EXHIBIT A

### FISHER BROTHERS v. CAMBRIDGE-LEE AND RELATED ACTIONS

Master File No. 82–4921
CLASS MEMBERS WHO HAVE ELECTED TO BE EXCLUDED FROM THE CLASS

1. Allied Bronze Corporation
   25–11 Hunterspoint Avenue
   Long Island City, New York  11101
2. Bennett Brake Service, Inc.
   803 West Rayen Avenue
   Youngstown, Ohio  44501
3. Besco Supply Company
   10910 East 56th Street South
   Tulsa, Oklahoma  74146
4. Blissfield Manufacturing Company
   626 Depot Street
   Blissfield, Michigan  49228
5. Brown Pipe and Supply of Artesia, Inc.
   701 South First Street
   P.O. Box 68
   Artesia, New Mexico  88210
6. Clark Hardware Company
   1414 Fourth Avenue South
   P.O. Box 23249
   Nashville, Tennessee  37202
7. Culver Company
   2623 East 54th Street
   P.O. Box 2345
   Huntington Park, California  90255
8. Duncan Supply Company, Inc.
   910 North Illinois Street
   Indianapolis, Indiana  46204
9. Ed's Supply Company, Inc.
   711 6th Avenue
   Nashville, Tennessee  37203
10. Erwin Supply Company
    P.O. Box 5
    Shinnston, West Virginia  26431

11. Eveready Burner Supply Corp.
    406 North Wantagh Avenue
    Bethpage, Long Island, New York
      11714
12. Franklin Supply
    4500 South Garnett, Suite 800
    P.O. Box 470700
    Tulsa, Oklahoma   74147
13. Grif-Fab Corp.
    5350 Newport Street
    Commerce City, Colorado   80022
14. International Cold Storage Company,
      Inc.
    215 East 13th Street
    P.O. Box 425
    Andover, Kansas   67002
15. Knox Tile and Marble Distributors
    11232 Indian Trail
    Dallas, Texas   75229–3584
16. Koppers Company, Inc.
    Pittsburgh, Pennsylvania   15219
17. Meier Metal Servicecenters, Inc.
    1471 East Nine Mile Road
    Hazel Park, Michigan   48030
18. Mercer County Automotive
      Warehouse, Inc.
    2370 Broadway Road
    West Middlesex, Pennsylvania   16159
19. Marex International Company
    165 Madeira Avenue
    Coral Gables, Florida   33134
20. Mississippi Wholesale Hardware, Inc.
    2313 14th Avenue North
    P.O. Box 826
    Columbus, Mississippi   39701
21. Mountain Plumbing Supply Company
    Main Street
    P.O. 17
    Tannersville, New York   12485
22. Noranda Metal Industries, Inc.
    U.S. Sales Office
    27 Glen Road
    Sandy Hook, Connecticut   06482
23. R & R Supply Company, Inc.
    P.O. Box 2166
    Orlando, Florida   32802
24. Sporlan Valve Company
    7525 Sussex Avenue
    St. Louis, Missouri   63143
25. Union Carbide Corporation
    Linde Division
    P.O. Box 710 (Middle Road)
    Ashtabula, Ohio   44004
26. Water Works Supply Company
    660 State Highway 23
    P.O. Box 306
    Pompton Plains, New Jersey   07444
27. Wise Supply Company, Inc.
    311 South Columbia Street
    Union City, Indiana   47390

28. Diamond Hill Supply Company, Inc.
    P.O. Box F–5
    Florence, South Carolina   29502
29. Virginia Sprinkler Co., Inc.
    P.O. Box 986
    Ashland, Virginia   23005
30. Daniel Radiator Corp.
    10650 Haddington Drive
    Houston, Texas   77043
31. Y/P Products, Inc.
    P.O. Box 308
    Emigsville, Pennsylvania   17318
32. Emergency Supply Co., Inc.
    6773–79 Olive Boulevard
    St. Louis, Missouri   63130
33. A & J Piping Products, Inc.
    821 Jupiter Road # 300
    Plano, Texas   75074
34. Lane Manufacturing Company, Inc.
    P.O. Box 1357
    Hartsville, South Carolina   29550
35. M & C Pipe & Supply, Inc.
    Rt. 1—Box 364M
    Leesburg, Florida   32748
36. Hi-Mill Manufacturing Co.
    1704 Highland Road
    Highland, Michigan   48031
37. Pumps, Inc.
    11072 West 44th Avenue
    Wheat Ridge, Colorado   80033
38. A & J Enterprises, Inc.
    P.O. Box 424
    Gates Mills, Ohio   44040
39. Major Supply, Inc.
    1133 Quaker Street
    Dallas, Texas   75207
40. Western Drilling Tool & Supply Co.,
      Inc.
    P.O. Box 593
    Chanute, Kansas   66720
41. Marmetal Industries, Inc.
    903 Sheehy Drive
    Horsham, PA   19044
42. Campbell Fittings, Inc.
    P.O. Box 238
    Boyertown, PA   19512
43. Allied Supply Company
    1100 E. Monument Avenue
    Dayton, Ohio   45402
44. Watkins, Inc.
    711 West Second Street
    P.O. Box 117
    Wichita, Kansas   67201
45. Offshore Traders, Inc.
    354 Sevilla Avenue
    Coral Gables, Florida   33134
46. Tondre Supply, Inc.
    313 Waterman Avenue, Rte # 104
    Smithfield, Rhode Island   02917