**In re IKON OFFICE SOLUTIONS, INC. SECURITIES LITIGATION.**

**Whetman,**

v.

**Ikon, et al.**

**No. MDL 1318.**

United States District Court, E.D. Pennsylvania.

Aug. 9, 2002.

E. Graham Robb, Weber Goldstein Greenberg & Gallagher, Philadelphia, PA, R. Douglas Dalton, Dalton Gotto Samson & Kilgard, Mark Andrew Fuller, Dalton Gotto Samson & Kilgard, Phoenix, AZ, David K. Isom, Matthew R. Howell, David K. Isom, Law Offices, Roger H. Hoole, Heather E. Morrison, Daniel Day, Hoole & King, LC., Salt Lake City, UT, Ronald Kilgard, Dalton, Gotto, Samson & Kilgard, PLC., Phoenix, AZ, Robert L. Palmer, Hennigan Bennett & Dorman, Los Angeles, CA, Joseph G. Zack, Weber Goldstein Greenberg & Gallagher LLP, Philadelphia, PA, for Plaintiffs.

Eleanor Morris Illoway, Elizabeth M. Chachis, Harkins Cunningham, Philadelphia, PA, W. Mark Gavre, Francis M. Wikstrom, Dianna M. Gibson, Parsons, Behle & Latimer, Salt Lake City, UT, Brian D. Roche, Sachnoff & Weaver, LTD., Chicago, IL, James G. Szymanski, M. Alexander Bowie, Louise W.

Pennington, Harkins Cunningham, New York City, Lisa E. Brody, Kleinbard, Bell & Brecker, Eric J. Schreiner, Kleinbard Bell & Brecker LLP, Philadelphia, PA, for Defendants.

## MEMORANDUM & ORDER

KATZ, Senior District Judge.

The parties have requested approval of settlement of this class action, brought under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*, on behalf of employees who were participants in or beneficiaries of their employer's retirement savings plan. The claims in this case concern alleged breaches of fiduciary duty with respect to the investment of employee retirement funds in the employer's stock. The proposed settlement includes a structural change to the plan permitting greater diversification of plan funds, but includes no monetary payment to the plan or to plaintiffs. After a fairness hearing on August 8, 2002, the court approves the settlement and issues a final judgment and order under Rule 54(b) of the Federal Rules of Civil Procedure.

I. Introduction

A. Background and Allegations

The claim now before the court is the last remaining claim of Multidistrict Litigation (MDL) No. 1318, referred to as *In re IKON Office Solutions, Inc. Securities Litigation* ("*In re IKON*").[1] In brief, the retirement savings plan at issue in this case was originally adopted on January 1, 1975 by Alco Standard,[2] the predecessor to IKON Office Solutions, Inc., ("IKON"). Until October 1, 1995, it was a pure employee stock ownership plan (ESOP), in which all contributions were invested in employer stock. As of October 1, 1995, the plan was amended to include a "self-directed" component by which employees could invest their own contributions in any of six investment vehicles, including five mutual funds and a sixth fund consisting entirely of IKON stock. Even after October 1, 1995, however, the employer's contribution was maintained as an ESOP, as these contributions went only into employer stock. Employer contributions were required to remain in employer stock until the employee reached age 55, at which time the employee could choose to keep the funds invested in company stock, or to diversify by redirecting them to any of the other five investment options. Thus, for every $3.00 that an employee contributed to one of the six investment options, the company would invest a matching contribution of $2.00 in company stock, up to 6% of the employee's salary, and such contributions would remain in company stock until the employee reached age 55 and redirected those funds. On January 1, 1997 this plan was renamed as the IKON Office Solutions, Inc. Retirement Savings Plan (the "Plan"). As of this writing, roughly half of the Plan funds were invested in IKON stock, and roughly half of the funds invested in IKON stock consisted of employer match contributions.

During the first half of 1998, IKON stock traded at a range of approximately $20.00 to $30.00 per share. At the end of the first half of 1998 and into the second half, it began falling steadily, reaching about $10.00 a share. On August 14, 1998, IKON announced a $110 million charge to earnings, including $94 million in pre-tax charges applied to its 1998 third fiscal quarter earnings and a restatement of its previously reported and unaudited 1998 second quarter earnings to reflect $16 million in pre-tax charges. Stock price declined even further and IKON

---

1. Other MDL No. 1318 cases include over a dozen cases consolidated under No. 98–CV–4286, which involved securities fraud class claims against IKON Office Solutions, Inc., certain individual defendants, and the company's accountants, Ernst & Young. The consolidated class claims against the company and the individual defendants settled for $111 million, with 30% of that amount awarded by this court in attorneys' fees, and a related derivative suit was settled for $5 million. *See In re Ikon*, 194 F.R.D. 166 (E.D.Pa.2000). Claims against the accountants were disposed of upon the court's grant of summary judgment for the defendants. *See In re Ikon*, 131 F.Supp.2d 680 (E.D.Pa.2001), *aff'd*, 277 F.3d 658 (3d Cir.2002).

2. In 1997, Alco spun off one of its lines of business under the name Unisource and changed its own name to IKON Office Solutions, Inc.

stock traded as low as $2.00 in late 2000 and early 2001. As of this writing, it is trading at $8.95 a share.

The ERISA claim is brought on behalf of a class by Julia Whetman and Judy Peterson, former employees of IKON and current participants in the Plan. *See* 3d Am. Compl. Count VIII ¶¶ 181–203 (alleging violations of ERISA). Defendants are IKON itself and twenty individuals, including IKON's former Chief Financial Officer,[3] the plan administrator, and others who served at some time on a Plan committee concerned with either administration or investments. Generally speaking, plaintiffs allege that defendants breached their fiduciary duties to Plan participants in the following ways: First, plaintiffs complain that defendants acted imprudently in requiring employer contributions to be invested in company stock until the employee reached age 55. Second, plaintiffs allege that defendants acted imprudently in continuing to offer company stock as an investment option for employee contributions. Third, plaintiffs allege that defendants breached their fiduciary duties by failing to communicate to Plan participants complete and accurate information about company stock, particularly with respect to the merits and risks of investing in IKON stock as opposed to diversifying their savings. Fourth, plaintiffs allege that defendants breached their fiduciary duties in failing to resolve conflicts of interests arising from their status as IKON "insiders" having loyalties divided between the company and the Plan. All of these claims are made against the backdrop of further allegations that IKON materially misstated its financial statements, causing its stock price to drop around the time that the company took the $110 million charge to earnings in 1998, and significantly lowering the value of plaintiffs' retirement savings.

The original complaint in this action, filed in February 1998 in the United States Court for the District of Utah, asserted employment-related claims against IKON by plaintiff Whetman. It was later amended to include, *inter alia*, the ERISA class action claim that is now before the court.[4] On December 2, 1999, the Judicial Panel on Multidistrict Litigation transferred this case to this court for consolidated or coordinated pretrial proceedings with *In re IKON*, No. 98–CV–4286. The ERISA claim is the only remaining claim in this case, having survived defendant's motion to dismiss on March of 2000. *See In re Ikon*, 86 F.Supp.2d 481 (E.D.Pa.2000).

By Order dated March 13, 2000 as reconsidered and clarified by Order dated May 12, 2000, this court conditionally certified a class in this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1) and 23(b)(3). *See In re Ikon*, 191 F.R.D. 457 (E.D.Pa. 2000); Order dated May 12, 2000. The ERISA class is defined as follows:

> All participants and beneficiaries of the Alco Standard Corporation Retirement Savings Plan or the IKON Office Solutions, Inc. Retirement Savings Plan (collectively without distinction the "Plan"), at

---

**3.** IKON and the individual defendants are jointly represented, with the exception of IKON's former Chief Financial Officer, Kurt Dinkelacker, who is separately represented. Dinkelacker has joined in the other defendants' Memorandum and Proposed Findings of Fact and Conclusions of Law supporting the approval of settlement. All defendants are collectively referred to throughout this memorandum as "defendants."

**4.** In May 1998 Whetman added two counts to her original complaint alleging violations of ERISA and of Racketeer Influenced and Corrupt Organizations ("RICO"), 18 U.S.C.1962(d). Whetman also named several individual defendants, all of whom have since been dismissed from the suit. In August 1999, Whetman revised her ERISA claim, proposing a class action and adding Judy Peterson as a second representative plaintiff. Thirteen individual defendants were added with respect to the ERISA claim, including the administrator and individuals who had served on the Plan administrative committee. Whetman's third amended complaint, filed in October 2000, added six individuals who had served on the Plan investment committee, as well as IKON's former Chief Financial Officer, Kurt Dinkelacker, for a total of twenty individual defendants. On March 1, 2000, this court dismissed other claims brought under Racketeer Influenced and Corrupt Organizations ("RICO"), 18 U.S.C.1962(d), but denied defendants' motion to dismiss the ERISA count. *See In re Ikon*, 86 F.Supp.2d 481 (E.D.Pa.2000). Whetman's individual employment-related claims, asserted in her original complaint, were dismissed with prejudice in December 2000 upon settlement.

any time after September 30, 1995, and through August 13, 1998, who suffered losses recognized under ERISA with respect to investments in the Alco Stock Fund or IKON Stock Fund. If the settlement described in the Notice of Pendency of Class Action Proposed Settlement and Hearing Thereon, dated January 14, 2000 (the "Securities Litigation Notice") is approved, the losses suffered by members of the ERISA Class who are also members of the "Global Class" (as defined in the Securities Litigation Notice) and do not opt out of such Global Class shall exclude losses of ERISA Class members that are due to acquisitions, directly or indirectly, of "IKON Securities" at wrongfully inflated prices during the "Class Period" (as those terms are used in the Securities Litigation Notice).

The class certification was explicitly conditional and without prejudice to defendants' arguments that no cause of action exists with respect to "holder" claims, *i.e.*, stock acquisitions before the beginning of the class period or any dates on which the plaintiffs establish that corrective action should have been taken. *See id.* The certification was also without prejudice to plaintiffs' arguments that the class period should be expanded. *See id.*

In May of 2001, Reliance Insurance Co., IKON's fiduciary liability insurer, was placed in rehabilitation. In August 2001, this court granted the Pennsylvania Insurance Commissioner's motion for a 180–day stay in this action, effective through January 31, 2002, as ordered by the Commonwealth Court of Pennsylvania. In October 2001, Reliance Insurance was placed in liquidation, where it remains.

Discovery was completed by September, 2001. After the stay was lifted, defendants moved for partial summary judgment and for decertification of the Rule 23(b)(1) class only. Defendants also filed a second motion seeking summary judgment on all of plaintiffs' breach of fiduciary duty claims. Plaintiffs responded to the motion for partial summary judgment and to the motion to decertify, but as settlement negotiations intensified the parties jointly sought and the court approved extensions in the briefing scheduling. Those negotiations produced the settlement agreement now proposed by the parties.

The parties had periodically engaged in settlement discussions since early in the litigation, including negotiations occurring prior to the transfer of this action to this court by the MDL Judicial Panel in December of 1999 and discussions with United States Magistrate Judge Jacob P. Hart in June of 2000. The parties halted negotiations during the six-month stay and resumed them after the stay was lifted, and tentatively reached agreement in April 2002. Upon receiving the parties' Stipulation of Agreement and Settlement and after a conference on May 14, 2002, this court granted preliminary approval of the settlement.

## B. The Terms of the Settlement

The keystone of the proposal is an amendment to the existing Plan term that requires employer match funds to be invested exclusively in IKON stock until the Plan participant is 55 years old. Specifically, the amended Plan would lift the age restriction, permitting each Plan participant who has at least two years of service to direct his employer match contributions to any of the Plan's investment options. The redirection of employer contributions already made would be subject to the vesting schedule set forth in the Plan, and also to temporary limitations on diversification that the Retirement Plans Committee concludes are reasonably necessary to protect against any stock price decline that a sudden, massive disinvestment by Plan participants might cause.

The second component of the settlement agreement addresses what plaintiffs describe as conflicts of interests arising out of the "insider" status of the defendants, which plaintiffs believe encouraged defendants to breach their fiduciary duties with respect to Plan investments or Plan members. This is addressed through the appointment of two independent advisors to serve the Retirement Plans Committee. One of plaintiffs' allegations is that communications from the defendants encouraged Plan participants to imprudently invest in IKON stock rather than diversify; thus, for up to three years an advisor will review all educational materials

related to diversification to be provided to Plan participants and make recommendations if the materials insufficiently communicate the merits of diversification. Any appointment within one year from settlement shall be made by IKON subject to reasonable approval by plaintiffs' counsel, and IKON is to bear the costs of such advisor for one year and the Plan will bear such costs thereafter. Other of plaintiffs' allegations are that defendants imprudently continued to offer IKON stock as an investment option for employee contributions and imprudently continued the mandatory investment of employer contributions in IKON stock until age 55; thus, a second advisor will, for a period of not less than three years, review and report periodically to the Retirement Plans Committee on the performance of the investment options offered to participants in the Plan, including company stock.

The third component of the settlement requires, should the Plan's fiduciary insurance policy be determined to have any value, that defendants assign to the Plan all of their unpaid claims or rights to payment under the policy in excess of the first 20% of the remaining policy limits. Both parties concede, however, that it is unlikely that the policy will have any value, as the insurer is currently in liquidation.

The fourth component of the settlement is that defendants agree not to contest an attorneys' fees award of up to five million dollars, and plaintiffs' counsel agrees to seek no more than six and a half million dollars in fees. No fees have yet been paid to plaintiffs' counsel with respect to this litigation.[5] Named plaintiffs also intend to apply to the court for an award of expenses and compensation in connection with their service as class representatives, and defendants have agreed not to challenge an award of five thousand dollars or less for each named plaintiff.

As noted, the proposed settlement does not afford a monetary award to plaintiffs, but its primary component is a structural change to the Plan that will permit employees under age 55 to "unlock" their employer contributions from mandatory investment in IKON stock. Counsel offers expert evidence and scholarly literature indicating that the unlocking of employer contributions is expected to add real monetary value to the class members' retirement investments by permitting diversification, which reduces the investments' risk level and consequently raises their economic value. Krishna Ramaswamy, professor of finance at the University of Pennsylvania's Wharton School, produced a written report as to the benefit in dollars of unlocking an IKON employee's company match funds from IKON stock before the employee reaches age 55. *See* Pls.' Mem. In Support of Proposed Settlement, Ex. B (Krishna Ramaswamy, *Valuation of Benefits to Employees Attributable to Removing the Restriction of Trading Placed on Company Stock in their Retirement Plans*, July 30, 2002). Professor Ramaswamy compared the return to risk ratio in a constrained portfolio—that is, a portfolio subject to the current Plan requirement that all employer contributions be invested in IKON stock until age 55—to the return to risk ratio in a portfolio having the same risk level as IKON stock, but lacking the constraint. *See id.* Professor Ramaswamy found that the return to risk ratio was higher when the constraint was lifted than when the constraint was in effect, and upon making certain assumptions was able to convert that additional return into specific dollar amounts for employees with certain representative characteristics. *See id.* The report includes dollar estimates of the benefits for employees aged 40 or 45 who have various percentages of their retirement portfolios in company contributions of IKON stock; the estimates range from a low of $23,000 for a 45–year–old with only 10% of his portfolio locked up in IKON stock, to a high of $93,900 for a 40–year–old with 100% of his portfolio locked up in IKON stock. *Id.* The more representative case of an employee who has 30% of his portfolio locked up in IKON stock is likely to recover $67,600 if he is 40 years old, and $51,800 if he is 45 years old. *See id.* Those with higher percentages

---

5. It is also noted that none of the plaintiffs' attorneys in this litigation represented any of the plaintiffs in the *In re IKON* class action securities fraud litigation, No. 98–4286, in which a sizable attorneys' fee was awarded upon settlement.

of their portfolios in company-contributed IKON stock would gain more; younger employees would gain more than older employees. *See id.* For the purposes of the report, Professor Ramaswamy assumed that the remainder of the employee's portfolio was already well-diversified and earning the best achievable return to risk ratio, and that such assumption was conservative as many employees also invest their employee contributions in company stock. *See id.* To the extent that such employees were to diversify any employee contributions placed in IKON stock in addition to their employer match contributions, they would reap benefits greater than those cited in the report. *See id.* Overall, plaintiffs represent that based on expert calculations the total economic value of the settlement is well over fifty million dollars.

Recent scholarly articles filed as exhibits strongly support the theory that employee retirement savings are quantifiably more valuable when diversified than when they are concentrated in an employer's stock. *See* Mem. and Proposed Findings of Fact and Conclusions of Law of IKON Defs. In Support of Approval of Settlement, as amended by Corrected Memorandum ("Defs.' Sett. Mem.") at Ex. A (Alicia H. Munnell & Annika Sunden, *401(k)s and Company Stock: How Can We Encourage Diversification?*, Center for Retirement Research at Boston College, July 2002), Ex. B (Olivia S. Mitchell & Stephen P. Utkas, *Company Stock and Retirement Plan Diversification*, Pension Research Council (April 2002) (working paper 2002–4), and Ex. C (Lisa Meulbroek, *Company Stock in Pension Plans: How Costly Is It?*, Harvard Business School (2002) (working paper no. 02–058, available from the author)). These articles discuss the current trend of investing retirement savings heavily in company stock through plans established by the company; the causes of this trend, including the common practice of locking up employer match funds in company stock, and the inclination of passive and unsophisticated employee investors to invest their own contributions in company stock as well; and the risks for employees of such poorly diversified investments. One draft article suggests that due to the increased risk associated with overinvestment in a single stock, employees effectively sacrifice an average of 42% of the market value of the firm's stock by failing to diversify. Meulbroek, *supra* (working paper at 3)). The articles generally recommend diversification of employer contributions out of company stock and further suggest that such diversification may also encourage employees to diversify their own contributions as well, leading to greater overall diversification and higher economic rewards; they also recommend improvements in the education of employee investors as to the benefits of diversification. *See id.;* Munnell & Sunden, *supra;* Mitchell & Utkas, *supra.*

The court finds Professor Ramaswamy's valuation to be reliable and supported by the scholarly literature submitted. However, even accepting his economic valuation of the unlocking of employer contributions, it is certainly a striking feature of this settlement that it lacks a cash award to the Plan or to Plan participants. The absence of any cash component has been "recognized as a prime indicator of suspect settlements." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank,* 55 F.3d 768, 783 (3d Cir.1995) (disapproving settlement consisting only of vouchers applicable toward purchase of new vehicle); *see also, e.g., In re MicroStrategy, Inc. Securities Litigation,* 148 F.Supp.2d 654, 659 (E.D.Va.2001) (describing settlement consisting only of company notes, stocks and warrants as "unusual" but "not unprecedented," and stating that "all instances of non-cash settlements ... merit[ ] particularly close scrutiny to determine whether [they] represent[ ] a verifiably fair and adequate settlement"). This issue will be discussed elsewhere in this memorandum; however, it is worth noting at the outset that the *General Motors* court disapproved of settlement not only or even primarily because the settlement was entirely non-cash, but also because it raised a whole host of concerns associated with the certification of a class for settlement purposes only, a procedure that at that time had not yet been fully examined by the courts. In contrast, this case does not raise such concerns and does not involve certification of a class simultaneous with approval of

settlement. Nonetheless, the court examines this settlement with an especially critical eye.

### C. The Fairness Hearing

On August 8, 2002, the court held a fairness hearing on the proposed settlement. Counsel for the settling parties outlined the settlement terms, their assessments of the appropriateness of the proposal, and the negotiations and considerations leading up to the agreement. Both named plaintiffs made statements in open court. No objections were raised at the hearing, but prior to the hearing, one individual acting without counsel submitted a written statement to the court presenting his objections to the proposed settlement. *See* Order of July 19, 2002 (filing communication dated July 17, 2002 by Daniel B. Heiskell and furnishing copies to counsel).

### II. Examination of Settlement

"The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re Gen. Motors*, 55 F.3d at 784. Nonetheless, the court has an obligation to ensure that class members' interests have been protected. Before approving a settlement, the court must examine whether adequate notice was issued to prospective class members. *See* Fed.R.Civ.P. 23(c)(2). The court must also determine whether a settlement class is properly certified under Federal Rules of Civil Procedure 23(a) and one of the three categories of class actions defined in Rule 23(b). Finally, the court must decide whether the proposed settlement itself is fair to settling parties and relevant third parties. *See* Fed.R.Civ.P. 23(e). Although the court may acknowledge that the proposed class is a settlement class, it may not even reach the fairness question if there is not a proper class and may not substitute the fairness inquiry for the Rule 23(a) and (b) inquiry. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620–21, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *In re Prudential Ins. Co. of Amer. Sales Practices Litig.*, 148 F.3d 283, 308 (3d Cir.1998).

### A. Adequacy of Notice

■ "In order to satisfy due process, notice to class members must be 'reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Lachance v. Harrington*, 965 F.Supp. 630, 636 (E.D.Pa. 1997) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). This determination must be made before inquiry into the merits is proper. *See In re Prudential*, 148 F.3d at 326–27; *Lachance*, 965 F.Supp. at 636; *see also* Fed.R.Civ.P. 23(e) (barring settlement of class action unless proper notice is made). As the parties ·seek a settlement class only under Rule 23(b)(1),

> the only notices required by the Federal Rules are those provided for in Rules 23(d) and (e). Rule 23(d) provides that the court may require that "notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action." Fed. R.Civ.P. 23(d)(2). As the Advisory Committee Notes to Rule 23 make plain, Rule 23(d)(2) "does not require notice at any stage, but rather calls attention to its availability and invokes the court's discretion." Fed.R.Civ.P. 23(d)(2) advisory committee note. Rule 23(e) addresses post-settlement notices and provides that "notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed. R.Civ.P. 23(e). Thus, in Rule 23(b)(1) [ ] class actions, Rule 23(d) provides that pre-settlement notice is entirely discretionary with the trial court. Rule 23(e) makes some form of post-settlement notice in Rule 23(b)(1) [ ] class actions mandatory, although the form of notice is discretionary. The discretion appropriate to Rule 23(b)(1) [ ] classes derives from the nature of the relief sought in these actions. Rule 23(b)(1) [ ] classes are cohesive in nature. Because of this cohesiveness, an adequate

class representative can, as a matter of due process, bind all absent class members by a judgment.

*Walsh v. Great Atlantic & Pacific Tea Co., Inc.,* 726 F.2d 956, 962–63 (3d Cir.1983). Furthermore, "Rule 23(e) mandates some form of notice of a proposed dismissal or compromise, but the form of notice of settlement of a Rule 23(b)(1) [ ] class action need only be such as to bring the proposed settlement to the attention of representative class members who may alert the court to inadequacies in representation, or conflicts in interest among subclasses, which might bear upon the fairness of the settlement." *Id.* at 963.

The notice provided met the requirements of due process and the Rules of Civil Procedure. Pursuant to the parties' stipulation and this court's Order entered August 7, 2000, notice of class action was mailed first-class to all class members. Pursuant to this court's Order of May 14, 2002, Notice of Pendency of Class Action, Proposed Settlement and Hearing Thereon (the "Settlement Notice") was sent on June 5, 2000 by first-class mail to the last known addresses of 51,481 class members, *see* Aff. of Carole K. Sylvester, as identified by the Plan's record-keeper and as used by him in disseminating other information pertinent to the Plan. Approximately 11,000 notices were returned as undeliverable, which is a somewhat greater percentage than the average of 10–15%, but not by any means extraordinary. *Id.* A summary of the Settlement Notice was also published in the *Wall Street Journal*'s national edition on June 14, 2002 and posted on counsel's web site, accessible to interested persons. *Id.*

The substance of the pre-settlement notice was adequate, as was the Settlement Notice. The Settlement Notice contained a detailed explanation of the terms in plain language, including a statement that no monetary relief was to be paid, as well as counsel's reasons for proposing the settlement and a discussion of the agreement as to attorneys' fees. The

names and contact information of relevant attorneys were provided, as were the requirements of submitting objections for consideration by the court.

The sole objector to this settlement, Daniel B. Heiskell, challenges the adequacy of the Settlement Notice in a submission to the court filed by Order of July 19, 2002. Mr. Heiskell complains of ambiguity in the Settlement Notice as to whether his presence was required at the fairness hearing. However, the language in the Settlement Notice stating that objectors "may appear in person or by attorney" at the hearing, but that objectors will be heard and any papers considered only upon the filing and service of specific information by a certain date, is clear and precise as to the requirements for properly raising objections.[6] Furthermore, although Mr. Heiskell objects to the requirement that objectors send copies of pertinent information to eight law firms and to the court, the court does not find that this requirement is unduly burdensome.

The summary of the Settlement Notice was also adequate, as it provided the essential terms including a statement explaining that no monetary relief was to be provided, as well as information on how to acquire the full Settlement Notice and the deadline for submission of objections.

### B. Class Certification

As noted, this court has already conditionally certified the class under both Rules 23(b)(1) and (b)(3). *See In re Ikon,* 191 F.R.D. 457. Defendants challenged the certification of the Rule 23(b)(1) class not only in their initial briefs on certification, but also in their subsequent motion for decertification filed not long before tentative settlement was reached. However, the parties have stipulated to a settlement class under Rule 23(b)(1) and defendants do not challenge the class for the purposes of settlement. *See* Defs.' Sett. Mem. at ¶ 46. The class definition for the purposes of settlement is the

---

**6.** Neither plaintiffs nor defendants asserted that Mr. Heiskell failed to meet these requirements. Plaintiffs' counsel represented at the hearing that his attempts to discuss Mr. Heiskell's concerns

with him were unfruitful, as Mr. Heiskell's telephone number is unlisted and as he did not respond to counsel's letter.

same as that which the court certified for trial under Rule 23(a) and (b)(1).

Thus, in the context of this proposed settlement, there are no objections to the class as previously certified; any further inquiry into issues of certification is unnecessary at this stage. Even assuming that certification for the purposes of settlement as opposed to trial is required or appropriate at this stage, the court's previous analysis is sufficient. In *In re Prudential,* 148 F.3d at 307–08, the Third Circuit articulated the primary differences between certification of a class for trial and for settlement in light of *Amchem,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689. The Third Circuit cautioned that settlement-only certification must not circumvent the full range of safeguards of certification for trial, *see In re Prudential,* 148 F.3d at 307–08, a concern that is not present here as the court has already fully applied those safeguards in certifying the class for trial. The *Prudential* court also noted that it is permissible for a court to "take the proposed settlement into consideration" when certifying a settlement-only class, *id.* at 308, and here the terms of the proposed settlement here only strengthen the reasons for certification, particularly as they resolve the challenge to the class raised in defendants' motion for decertification. Specifically, defendants' motion argues that the monetary claims are not for plan-wide relief but are for restitution to individual accounts, and that such individual relief is not obtainable under ERISA section 502(a)(2). *See* 29 U.S.C. § 1132(a)(2) (establishing a cause of action under 29 U.S.C. § 1109); *id.* at § 1109 ("Any person who is a fiduciary with respect to a plan who breaches [such fiduciary duty] shall be personally liable to make good *to such plan* any losses *to the plan* . . .")(emphasis added). Since the monetary claims are for individual relief and not plan-wide, defendants argue, the class is inappropriate for certification under Rule 23(b)(1). The proposed settlement, however, disposes of this concern as it affords no monetary relief.

In further discussing the certification of a settlement-only class, the *Prudential* court also noted that "the key to *Amchem* appears to be the careful inquiry into adequacy of representation," *In re Prudential,* 148 F.3d at 308, which has several purposes. It first "serves to uncover conflicts of interest between named parties and the class they seek to represent"; it also "tests the qualifications of the counsel to represent the class." *Id.* at 312 (citations, internal punctuation omitted); *see also In re Gen. Motors,* 55 F.3d at 800 (focusing on same issues). The court must consider whether class counsel has adequate experience, "vigorously prosecuted the action," and "acted at arm's length from the defendant." *In re Gen. Motors,* 55 F.3d at 801.

As to the first inquiry, no true conflicts have been identified between the lead plaintiffs and those they seek to represent, and the court sees none upon its own examination. The structural changes are plan-wide and to the extent that the monetary value of these changes vary among different class members, such variations flow rationally from differences in the amount of locked stock each class member holds and the amount of time during which the employee will benefit from the pre–age–55 unlocking. There may be the appearance of a conflict in that of the over 51,000 class members, 18,934 individuals are no longer participants in the Plan and thus will not benefit from the structural changes to the Plan. *See* Pls.' Revised Proposed Findings of Facts, Conclusions of Law and Order Concerning Settlement. However, the primary benefit of the settlement, the freedom to direct employer contributions into investments other than IKON stock, is already enjoyed by the former participants since, upon an employee's disenrollment from the Plan, any locked funds in his account are automatically divested from IKON stock. *Cf. In re Gen. Motors,* 55 F.3d at 800–01 (finding inadequacy in part because terms of settlement afforded one group of plaintiffs "significantly less value than" another group). Furthermore, the relief provided to current participants is not adverse in any way to the former participants. *Cf. Amchem,* 521 U.S. at 625–28, 117 S.Ct. 2231 (finding inadequacy in part because interests of some plaintiffs "tug[ged] against" the interests of other plaintiffs). In practical terms, the settlement creates no objectionable disparity of treatment or conflicts of in-

terest between former and current Plan participants.

As to the second inquiry, plaintiffs' counsel clearly possess the expertise to litigate this matter effectively, as evidenced by the quality, timeliness and professional nature of their work before this court. The case has been vigorously litigated, from the filing of the initial complaint and its two subsequent amendments, through numerous discovery battles, a motion to dismiss, the several stages of argument concerning class certification, and the motions for summary judgment, partial summary judgment and decertification pending at the time that the parties reached tentative settlement.

As to the questions of whether class counsel has acted at arm's length from the defendants and fulfilled its fiduciary duty to the entire class, these inquiries should take into consideration that the settlement provides no monetary relief for class members while providing for an uncontested fee award of five million dollars. *See In re Gen. Motors,* 55 F.3d at 803 (acknowledging that fees might play a role in evaluating this factor). The non-cash nature of this settlement will be specifically addressed later in this memorandum; at this point, the court notes that aside from the non-cash nature of the settlement, all other indicia suggest that class counsel acted at arm's length and fulfilled its fiduciary duty to the class. Negotiations were first initiated several years ago and broke off several times, reportedly due to plaintiffs' demand for a cash component and defendants' resistance to that demand in light of the sizable settlement paid to resolve the securities fraud litigation. Settlement was reached only after protracted negotiations and years of active litigation, including substantial and nonfrivolous motion practice. Furthermore, while in *In re Gen. Motors, id.,* the Third Circuit objected to the fact that the settlement notice did not disclose the fee agreement of $9.5 million, in this case the Settlement Notice included a clear explanation of the fee agreement, and no objection raised that issue in any meaningful way. In addition, this is not a situation in which counsel "effected a settlement that would yield very substantial rewards to them after what

... was little work." *Id.* (agreement for $9.5 million in fees reached only four months after suit was filed).

### C.   Fairness

■   A settlement of a class action may not be approved unless it is "fair, adequate, and reasonable." *Walsh,* 726 F.2d at 965; *see also Eichenholtz v. Brennan,* 52 F.3d 478, 482 (3d Cir.1995) (same). The Third Circuit has gone so far as to suggest that the district court must act as a fiduciary in protecting the interests of absent class members. *See In re Gen. Motors,* 55 F.3d at 785. To allow for meaningful appellate review, the district court must explain on the record its reasons for approving a class action settlement. *See Eichenholtz,* 52 F.3d at 488.

> Relevant factors in assessing fairness are: (1) the complexity, expense, and likely duration of the litigation ..., (2) the reaction of the class to the settlement ..., (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ..., (9) the range of reasonableness of the settlement to a possible recovery in light of all the attendant risks of litigation[.]

*Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir. 1975) (citations omitted); *see also In re Gen. Motors,* 55 F.3d at 785; *Eichenholtz,* 52 F.3d at 488. In addition, the Third Circuit has noted that in certain circumstances it may be appropriate to consider additional factors, such as

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the

settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Prudential,* 148 F.3d at 323. The proponents of settlement bear the burden of establishing that these factors support settlement. *See In re Gen. Motors,* 55 F.3d at 785. In addressing a settlement, the court must scrupulously ensure that the proposed settlement is in the best interests of class members by reference to the best possible outcome, but also must not hold counsel to an impossible standard, as a settlement is virtually always a compromise, "a yielding of the highest hopes in exchange for certainty and resolution." *Id.* at 806; *see also Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 804 (3d Cir.1974) (noting that the court should not turn the fairness inquiry into a full-fledged trial on the merits); *Sommers v. Abraham Lincoln Fed. S & L Ass'n,* 79 F.R.D. 571, 576 (E.D.Pa.1978) (recommending caution before rejecting settlement proposed by experienced counsel).

### 1. Complexity and Duration

"This factor is intended to capture 'the probable costs, in both time and money, of continued litigation.'" *In re Gen. Motors,* 55 F.3d at 812 (quoting *Bryan,* 494 F.2d at 801). At the time that the parties reached agreement as to the proposed settlement, significant motions by the defendant were pending for partial summary judgment, for summary judgment, and for decertification. The motions raise numerous complex issues—some novel under ERISA—including whether the monetary relief sought is permitted under either ERISA section 502(a)(2), or under section 502(a)(3) pursuant to a recent 5–4 decision of the Supreme Court, *see Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002); whether any defendant owed any fiduciary duty in light of his or her alleged lack of discretion as to Plan investment op-

tions; and the potentially preclusive effect of the release provision of the securities fraud class action settlement, an issue that had been raised at the time of that settlement, *see In re Ikon,* 194 F.R.D. at 173, 185, and renewed in the context of this litigation. Litigation of these motions alone would involve costs of additional, extensive briefing and a likely court hearing. Trial would require lengthy inquiries into the question of each of the twenty individual defendants' fiduciary role under ERISA; whether any communications from defendants to the class members constituted a material misrepresentation as to risks of investing in the IKON stock; and whether the company's financial statements were in fact misstated under accounting principles, a particularly fact-intensive inquiry requiring close scrutiny of IKON's finances and accounting statements. Whether or not the case proceeded to trial, an appeal and associated costs would be nearly certain. This factor weighs in favor of the proposed settlement.

### 2. Class Reaction

"This factor attempts to gauge whether members of the class support the settlement." *In re Prudential,* 148 F.3d at 318. Although the number of those expressing objections or choosing to opt-out of the class is some measure of the strength of the opposition, courts must be cautious about "inferring support from a small number of objectors to a sophisticated settlement." *In re Gen. Motors,* 55 F.3d at 812.

Even acknowledging these principles, the court recognizes that of approximately 51,000 class members, only one person raised objections before the court. The court concludes that the objector has not provided a substantive basis for disapproval of the settlement. Mr. Heiskell's objections to the adequacy of notice have already been addressed. *See supra* at Sec. II.A. Mr. Heiskell also objects to the collection of attorneys' fees because such fees are "not based on how many hours [the attorneys] really worked, or what good they did," *id.;* however, the fee petition, which is forthcoming, will be analyzed based on precisely such factors and others if contested. Mr. Heiskell complains of the lack of

monetary relief, but does not acknowledge the nonmonetary relief that will generate tangible benefits through the potential for diversification and address the conflicts of interest that his counsel believe contributed to his loss. The remaining statements by Mr. Heiskell express his general dissatisfaction with the settlement as inadequate to punish IKON or to reward Mr. Heiskell and others for their service and loyalty to their employer. The court acknowledges these concerns, but does not find them specific enough or otherwise sufficient to serves as grounds for disapproval. This factor weighs in favor of the proposed settlement.

### 3. Stage of the Proceedings and Amount of Discovery Completed

A settlement should not be approved if the parties do not have an " 'adequate appreciation' " of the merits of the case. *In re Prudential*, 148 F.3d at 319 (quoting *In re Gen. Motors*, 55 F.3d at 813). Consequently, the type and amount of discovery that has occurred since the commencement of the action are relevant to the propriety of settlement.

Counsel have invested sufficient time and attention to the merits of the case to have a reasoned opinion of its settlement value as well as whether settlement is the prudent course of action. All discovery is completed, and it was extensive. Much of the discovery was completed in tandem with the extensive discovery in the consolidated securities fraud cases against IKON and its accountants, which was previously documented by this court. *See In re Ikon*, 194 F.R.D. at 180. Experts on both sides have engaged in analyses of the complex issues and data, as evidenced by their motions practice and settlement briefings. As noted, both sides have vigorously explored the merits of class certification on several occasions, and defendants have filed comprehensive motions for summary judgment on all plaintiffs' breach of fiduciary duty claims and on the unavailability to plaintiffs of monetary damages in this ERISA context. On this record, there is no doubt that sufficient information is available for counsel for both parties to make an informed evaluation of the strengths and weaknesses of their respective positions and of the appropriateness of settlement. *See In re Aetna Inc. Sec. Litig.*, Civ. Act. No. MDL 1219, 2001 WL 20928, at *7 (E.D.Pa. Jan.4, 2001) (discovery complete, summary judgment motions ripe for decision; parties had fully assessed merits of case). This factor weighs heavily in favor of the proposed settlement.

### 4. Risks of Maintaining the Class Action through Trial

"The value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits. Thus, the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the action." *In re Gen. Motors*, 55 F.3d at 817.

As previously noted, class certification has faced many challenges. The court's certification itself was explicitly conditional. As noted, defendants' motion for decertification and motion for partial summary judgment argue that the type of monetary relief sought is not plan-wide, but constitutes only individual relief inappropriate under ERISA and for class treatment. This issue weighs in favor of settlement, as the settlement eliminates any risks of maintaining the class through trial.

### 5. Risks of Establishing Liability and Damages

These inquiries "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential*, 148 F.3d at 319. For example, if it appears that further litigation would realistically risk dismissal of the case on summary judgment or an unsuccessful trial verdict, it is in the plaintiffs' interests to settle at a relatively early stage. In contrast, if it appears that liability is extraordinarily strong, and it is highly likely that plaintiffs would prevail at trial, settlement might be less prudent. On this issue, the court should avoid conducting a mini-trial and must "to a certain

extent, give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action." *Lachance*, 965 F.Supp. at 638.

It is once again noted that tentative settlement was reached shortly after defendants filed two motions for summary judgment challenging the factual and legal underpinnings of plaintiff' case, both as to liability and to damages, and providing both sides with a well-developed picture of the risks of dismissal of the case. The threshold legal question raised by defendants' motion for partial summary judgment is whether the monetary relief sought is recoverable under ERISA. As noted, defendants' motion argues that plaintiffs' monetary claims are for individual, not plan-wide, relief, and that such individual relief is not obtainable under ERISA section 502(a)(2). 29 U.S.C. §§ 1132(a)(2), 1109. Plaintiffs maintain that their claims under section 502(a)(2) are viable; however, they explicitly recognize other risks in proceeding with this litigation.

For example, plaintiffs acknowledge the controversial nature of the second argument raised in defendants' motion for partial summary judgment, which is that since the plaintiffs are seeking recovery as individual participants and not plan-wide, any recovery must be pursuant not to ERISA section 502(a)(2), but rather must be pursuant to section 502(a)(3), which provides only for injunctive or "other appropriate equitable relief." *See* 29 U.S.C. § 1132(a)(2), (3). Defendants claim that the monetary relief sought by plaintiffs is legal, not equitable, and is thus barred according to a recent United State Supreme Court decision concerning the nature of equitable remedies under ERISA. *See Great–West Life*, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635. In *Great–West*, plaintiff sought to recover from plan beneficiaries the proceeds of a class action settlement, which had been deposited in a trust and partially spent on attorneys' fees, on the grounds that the ERISA plan provided plaintiff the right to recoup payments made to beneficiaries by a third party. *Id.* However, the Court held that a claim for such restitution was not permissible under section 502(a)(3) because the restitution sought was legal, not equitable, since "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to plaintiff particular funds or property in the defendants's possession." *Id.* at 714–15. Defendants claim that the monetary relief sought by plaintiffs in this case is similarly legal and not equitable. Although plaintiffs seek relief primarily under section 502(a)(2), to the extent that their claims might rely, additionally or in the alternative, on section 502(a)(3), plaintiffs have stated their recognition that the 5–4 decision in *Great–West* has caused considerable controversy as to the viability of certain section 502(a)(3) claims, and that the issue remains unsettled.

Plaintiffs submit that their claims rest much more heavily on the theory that IKON earnings and stock price were inflated by means of material misstatements in IKON's year-end 1997 financial statements, causing a collapse in IKON stock price, and that defendants breached their fiduciary duties in encouraging continued investment in company stock despite these misstatements. That such misstatements were in fact made, and that they caused a substantial decline in stock price, are significant factual prerequisites to plaintiffs' success on these claims. Although the court does not have the benefit of the ERISA plaintiffs' expert opinions in this regard, the ERISA plaintiffs concede that the challenges of establishing these prerequisites are demonstrated by this court's grant of summary judgment against the securities fraud plaintiffs and in favor of IKON's accountants, which found, *inter alia*, that plaintiffs failed to raise a genuine issue of material fact as to whether the accounting inaccuracies in fact caused IKON stock price to decline. *See In re Ikon*, 131 F.Supp.2d 680, *aff'd*, 277 F.3d 658 (3d Cir.2002).

Another risk recognized by plaintiffs is that the release provision of the $111 million settlement in the securities litigation against IKON may extinguish some of the ERISA claims, specifically those based on the acqui-

sition of IKON stock at inflated prices.[7] *See In re Ikon*, 194 F.R.D. at 173, 185. For present purposes it is sufficient to note that at the time of that settlement, the ERISA plaintiffs themselves sought clarification from the court of the effect of the release provision on their ERISA claims, but the court found the question to be premature. *See id.* at 185. Defendants have renewed the issue in their motion for summary judgment, and the issue remains unresolved.

Finally, a review of some other factual and legal prerequisites to plaintiffs' success is appropriate at this juncture, although plaintiffs do not concede a risk in these areas and the court does not attempt to evaluate any such risk, particularly as it does not have the benefit of full briefings on these issues. As to all their claims, plaintiffs would first have to establish that a defendant owed a fiduciary duty with respect to any action alleged to be a breach of that duty. *See Coleman v. Nationwide Life Insurance Co.*, 969 F.2d 54, 61 (4th Cir.1992) ("[A] court must ask whether a person is a fiduciary with respect to the particular activity at issue.") In short, plaintiffs would have to show that defendants— IKON itself and individuals who served at various times on the administrative or investment committees of the Plan—exercised discretionary authority over plan management or assets, or rendered investment advice for compensation. *See* 29 U.S.C. § 1002(21)(A).[8] Since the terms of the Plan either mandated or expressly intended both the company lockup of employer match contributions and the offering of IKON stock as an investment vehicle for employee contributions, defendants argue that none of the defendants exercised discretionary control in these areas and therefore owed no fiduciary duties, or, in the alternative, enjoy an extremely deferential standard of review as to any action con-

stituting an alleged breach. *See Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir.1995) (actions of "directed trustee[s]" are "essentially" "immune from judicial inquiry"); *id.* ("abuse of discretion" standard requires overcoming of presumption of prudence via showing of, *e.g.*, failure to serve purpose of trust or settlor's intent). With respect to the claims of misrepresentations or omissions, if fiduciary status was established plaintiffs would then be required to show that any misrepresentations as to the prudence of investing in IKON stock were "material," and also that plaintiffs detrimentally relied on that misrepresentation in making investment decisions. *See Daniels v. Thomas & Betts Corp.*, 263 F.3d 66, 73 (3d Cir.2001); *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 242 F.3d 497, 505 (3d Cir.2001); *see also In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 442 (3d Cir.1996) (misrepresentation is material only if "there [is] a substantial likelihood that it would have misled a reasonable participant in making an adequately informed decision about whether to place or maintain monies in" particular investment option).

These factors weigh heavily in favor of settlement.

### 6. Defendants' Ability to Withstand Greater Judgment

As noted, IKON's fiduciary liability insurer, Reliance Insurance, is in liquidation and both parties agree that any recovery of significant insurance funds is unlikely. IKON has agreements to indemnify the individual defendants in this case, and thus the burden of any judgment for damages would appear to fall on IKON alone. However, it is not argued that even a very significant judgment would jeopardize IKON's financial health. Yet this settlement contains no monetary

---

7. The settlement in the securities fraud litigation against IKON and the individual defendants releases, in part, "all claims ... arising out of, relating to, or in connection with purchases or acquisitions by any other means, directly or indirectly, of IKON Securities at prices which are alleged to have been wrongfully inflated during the Class Period." *In re Ikon*, 194 F.R.D. at 173.

8. A fiduciary under ERISA is one who exercises "discretionary authority or discretionary con-

trol" respecting plan management or disposition of plan assets, who "renders investment advice for a fee or other compensation" with respect to plan moneys, or who has discretionary authority or responsibility in the administration of a plan. 29 U.S.C. § 1002(21)(A); *see Lockheed Corp. v. Spink*, 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996) ("[O]nly when fulfilling certain defined functions ... does a person become a fiduciary.") (citation, punctuation omitted).

award at all, and furthermore the costs to IKON of providing the structural relief are truly *de minimis*. This factor weighs against the proposed settlement; however, as the court will shortly explain, certain unique factors also support a non-cash settlement in this case.

  7.  Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation

"In order to assess the reasonableness of a proposed settlement seeking monetary relief, 'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.'" *In re Prudential*, 148 F.3d at 322 (quoting *In re Gen. Motors*, 55 F.3d at 806). As already discussed, the value of the unlock is calculated, in a representative case, at $51,800 for a 45-year-old employee with 30% of his portfolio locked up in IKON stock, and at $67,600 for a 40-year-old employee with the same portfolio. The court does not have information on which to estimate a dollar figure of plaintiffs' best possible recovery, but plaintiffs represent that the partial rebound of IKON's stock price, among other factors, has contributed to a substantial reduction in their expert's damages estimate, which was over $100 million at the outset of this litigation but is now, based on current data, a more modest figure in the tens of millions of dollars. Furthermore, it has been argued that no monetary recovery is possible at all in these circumstances, and plaintiffs have recognized that certain claims may be extinguished by virtue of the release provision of the prior class settlement of the securities fraud claims. These factors, when combined with the factual and legal obstacles to maintaining the class and the establishing fiduciary obligations, material misrepresentations, reliance, and causation, could reduce a potential award substantially.

  8.  *Appropriateness of Non–Cash Settlement*

As to the specific absence of monetary relief, there are at least five reasons that a non-cash settlement is more appropriate in this case than it may be in others. First, it is once again noted that the proposed settlement was reached in the shadow of a motions arguing that the monetary relief sought by plaintiffs was not recoverable at all under ERISA or on a class-wide basis. The threat of a legal bar to any recovery of monetary relief is obviously a legitimate consideration of counsel when assessing the appropriateness of a non-cash settlement. Second, expert evidence found reliable by this court attributes substantial and concrete monetary value to the structural relief afforded by the settlement. Third, nearly all of the ERISA class plaintiffs[9] are also members of the class that obtained a $111 million settlement from IKON for claims of securities fraud. Such ERISA plaintiffs are eligible to receive the same compensation and measure of damages as the non-ERISA plaintiffs in that case who suffered losses based on the artificial inflation of the stock prices, to the extent permitted by that settlement's plan of allocation. Fourth, while the Third Circuit found the settlement in *General Motors*, 55 F.3d 768, suspicious in part because it was non-monetary, it identified numerous other factors supporting disapproval, none of which are present to this case.[10] Fifth, it is not in

---

9.  The only ERISA plaintiffs who were not covered under the prior settlement are those who left the Plan during the four-month period covered by the ERISA class but not covered by the securities fraud class, that is, from October 1, 1995 and January 24, 1996.

10.  In *General Motors*, plaintiffs were purchasers of certain GM trucks that may have had a fuel-tank design defect rendering the trucks more vulnerable to fires in side collisions. *Gen. Motors*, 55 F.3d at 777. The *General Motors* court found defendant's settlement offer of a $1,000 voucher to each class member toward a purchase of a new GM truck to be of little value, considering the severe restrictions placed on the vouchers and the slim likelihood that replacement trucks could or would be bought. *Id.* at 808–09; *see also Clement v. American Honda Finance Corp.*, 176 F.R.D. 15, 27–28 (D.Conn. 1997) (disapproving settlement because, *inter alia*, settlement was comprised in large part of restricted and speculative coupons which were "essentially worthless" to class members). In contrast, in this case the unlocking of company stock quantifiable raises the economic value of

the interest of class members to obtain a truly large cash settlement in the range of hundreds of millions of dollars that could affect the value of IKON stock or its financial health, as class members may have interests in continued employment with IKON and in protecting the value of their existing retirement savings, approximately 50% of which is currently invested in IKON stock.

These considerations do not in any way substitute for a thorough exploration of the settlement's fairness, in which the court has already engaged. However, these factors, in addition to the other factors discussed, help to reassure the court that this settlement is indeed fair, adequate and reasonable, despite the fact that it does not include any monetary payment.

III.  Conclusion

The settlement class in this action is properly certified, notice was properly distributed, the settlement itself is fair to all parties, and the objections are legally insignificant. Of the *Girsh* factors, only one weighs against approval of the settlement, the defendant's ability to withstand greater judgment, and this factor is not in itself dispositive. *See Gilman v. Independence Blue Cross*, Civil Action No. 96–1601, 1997 WL 633568, at *9 (E.D.Pa. Oct.6, 1997) (ERISA defendants agreed to alter manner of calculating health insurance deductible; likely ability to withstand greater judgment alone does not militate against approval where most significant aspect of settlement is prospective and not monetary relief). Plaintiffs acknowledge specific risks to establishing both liability and damages, and there also may be a risk of decertification should plaintiffs pursue monetary relief. Finally, although there is no cash component to this settlement, this is not by any means an unprecedented occurrence and in this case, this fact is mitigated by the particular circumstances of this case.

The settlement is approved. An appropriate Order follows.

## FINAL JUDGMENT OF DISMISSAL WITH PREJUDICE AS TO ALL DEFENDANTS

The Stipulation and Agreement of Settlement dated May 13, 2002 (the "Stipulation") having been executed and filed by Plaintiffs (as defined below) and Settling Defendants (as defined below); the Court having entered its Preliminary Approval Order thereon on May 14, 2002, directing that notice of the proposed settlement (the "Settlement") of the Litigation (as defined in the Stipulation) be published and mailed to the members of the Class (as defined below) and scheduling a hearing to be held to determine, among other things, whether the Settlement should be approved as fair, reasonable and adequate, said notice having been given; a hearing having been held on August 8, 2002, at which all interested persons were given an opportunity to be heard; and the Court having read and considered all submissions in connection with the Settlement, and having reviewed and considered the files and records herein, the Court finds and concludes that:

The only remaining count in this Litigation was brought under the Employee Retirement Income Security Act of 1974, 29 U.S.C.

---

plaintiffs' investments, and further benefits may be gained by virtue of the other structural relief intended to increase the sophistication of employee investors. The GM voucher scheme was also deemed to be, "in reality, a sophisticated GM marketing program" benefitting the defendant, as it simply encouraged plaintiffs to purchase more GM products, *In re Gen. Motors*, 55 F.3d at 807; here, in contrast, the ability to diversify funds out of IKON stock leaves IKON with investors who are likely to be less loyal and predictable than the average passive, unsophisticated employee investor. Furthermore, the mechanisms designed to protect IKON stock from rapid decline due to sudden and massive disinvestment do not only benefit defendant, but benefit the plaintiff class as a whole by protecting those class members who divest later or do not divest at all. Also, in *General Motors* the voucher scheme treated different groups of plaintiffs differently, a fact "with serious implications for the fairness of the settlement and the adequacy of representation of the class." *Id.* at 777. In contrast, this settlement contains only plan-wide relief, and although former participants cannot benefit from the structural changes, there is no practical disadvantage to those class members, as discussed. Finally, the *General Motors* court expressed great concern with the nearly $9.5 million fee agreement reached in that case, particularly as counsel had engaged in a minimal exploration of the case's merits, *id.* at 803–04; in contrast, the fee agreement in this case was reached only after years of vigorous litigation.

§§ 1001 *et. seq.* ("ERISA"). Plaintiffs allege breaches of fiduciary duties in violation of ERISA by IKON Office Solutions, Inc. ("IKON") and Elisabeth H. Barrett, William M. Bauer, O. Gordon Brewer, Jr., J. Kenneth Croney, Michael J. Dillon, William F. Drake, Jr., Nancy J. Heiden, Richard M. Eisenstaedt, Karin M. Kinney, Larry O. Kludt, Hugh G. Moulton, J.F. Quinn, Beth B. Sexton, James W. Stratton, Paul C. O'Neill, Jr., J. Mahlon Buck, Jr., James Forese, Frederick Hammer, Thomas Gerrity and Kurt Dinkelacker (collectively, without IKON, the "Individual Defendants" and collectively, with IKON, the "Settling Defendants").

The Litigation was commenced by Julia Whetman in February 1998 in the United States District Court for the District of Utah, Central Division, asserting employment-related claims against IKON. *Julia Whetman v. IKON Office Solutions, Inc.,* Civil No. 2–98–CV–89. Whetman amended her complaint three times to assert additional claims under RICO and ERISA, add an additional plaintiff, Judy Peterson (with Whetman, the "Named Plaintiffs" and with the Class, the "Plaintiffs"), add the Individual Defendants, and propose a class action with respect to the ERISA claim only. All counts except the ERISA claim have been dismissed.

In December 1999, the Judicial Panel on Multidistrict Litigation transferred the Litigation to the Eastern District of Pennsylvania for consolidated or coordinated pretrial proceedings with *In re IKON Office Solutions, Inc. Securities Litigation,* File No. 98–CV–4286 (MK). On March 13, 2000, the Court conditionally certified a class (the "Class") for the ERISA claim as follows:

> All participants and beneficiaries of the Alco Standard Corporation Retirement Savings Plan or the IKON Office Solutions, Inc. Retirement Savings Plan, at any time after September 30, 1995, and through August 13, 1998, who suffered losses recognized under ERISA with respect to investments in the Alco Stock Fund or IKON Stock Fund.

Pursuant to Federal Rules of Civil Procedure 23(e) and 23(b)(1), the class was certified for settlement purposes in the May 14, 2002 Preliminary Approval Order.

In accordance with the Stipulation, and an Order of the Court entered on May 14, 2002, Plaintiffs mailed to the Class a notice (the "Notice") dated June 5, 2002, of the Settlement and the opportunity to object to the Settlement. Plaintiffs also caused the Notice to be published electronically on an internet site maintained by Plaintiffs' Counsel. Plaintiffs caused a summary notice (the "Summary Notice") to be published in the national edition of *The Wall Street Journal* on June 14, 2002. Affidavits and/or declarations regarding the dissemination of the Notice and publication of the Summary Notice were filed with the Court on August 1, 2002.

The Notice and Summary Notice provided to the Class constitute the best notice practicable under the circumstances and include individual notice to all members of the Class who could be identified by reasonable effort. The affidavits or declarations filed with this Court on August 1, 2002 demonstrate that this Court's Order with respect to the Notice and Summary Notice has been complied with and further, that the best notice practicable under the circumstances was in fact given and constituted valid, due, and sufficient notice to members of the Class, complying fully with due process and Rule 23 of the Federal Rules of Civil Procedure.

Plaintiffs and the Settling Defendants have applied to the Court for approval of the terms of the Stipulation and for the entry of this Order and Final Judgment. Pursuant to the Notice and Summary Notice, and upon notice to all Parties, a hearing was held before this Court on August 8, 2002, to consider among other things whether the Settlement should be approved by this Court as fair, reasonable, and adequate.

Approval of the Stipulation will result in substantial savings in time and money to the Court and the litigants and will further the interests of justice.

The Stipulation is the product of good faith arms'-length negotiations by the Parties thereto.

NOW THEREFORE, GOOD CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1. To the extent they are not otherwise defined in this Final Judgment, capitalized terms used herein shall have the definitions ascribed to those terms in the Stipulation.

2. Named Plaintiffs and all members of the Class are bound by this Order and Final Judgment and by the Stipulation, including the releases provided for in this Order and Final Judgment.

3. Whether or not the Effective Date occurs, neither the Stipulation nor the Settlement, nor any act performed or document leading to or executed pursuant to or in furtherance of the Stipulation or the Settlement: (a) is or may be deemed to be, or may be used as an admission of, or evidence of, the validity or invalidity of any Settled Claim, or of any alleged wrongdoing or liability of the Settling Defendants or the Released Parties, or any of them, or the lack thereof, or that the Settling Defendants' defenses are or are not meritorious; or (b) is or may be deemed to be, or may be used as an admission of, or evidence of, any alleged fault or omission of any of the Settling Defendants or the Released Parties in any other civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal; (c) provided, however, that the Stipulation and Settlement may be introduced in such proceedings as may be necessary to consummate or enforce the Stipulation, the Settlement, or the Order and Final Judgment, and if the Stipulation and Settlement become effective, the Settling Defendants or other Released Parties, or any of them, may file the Stipulation and/or the Order and Final Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, judgment, bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim, or in connection with the assertion of claims or rights under the Reliance Insurance Policy.

4. The Stipulation and Settlement are fair, reasonable and adequate as to the Class, and the Stipulation and the Settlement are hereby finally approved in all respects, and Plaintiffs and Settling Defendants are hereby directed to consummate and perform its terms.

5. The Litigation and the Settled Claims (as defined below) are finally and fully compromised and settled, and the Complaint is dismissed on the merits and with prejudice.

6. Upon the Effective Date, Plaintiffs, on behalf of the Plan and themselves, shall release and discharge the Released Parties (as defined below) from the Settled Claims (as defined below).

   a. "Released Parties" means the Settling Defendants, the Plan, and any and all of their former and present parents, subsidiaries, affiliates, partners, employees, directors, officers, agents, accountants, attorneys, financial advisors, consultants, administrators, trustees, and all of their respective predecessors, successors, assigns, agents, heirs, representatives, executors and administrators. With the sole exception of any claim that the Plan may have against Reliance pursuant to an assignment as contemplated in Section 4.c of the Stipulation, the term "Released Parties" shall also include Reliance and any and all of its former and present parents, subsidiaries, affiliates, partners, employees, directors, officers, agents, accountants, attorneys, financial advisors, consultants, administrators, trustees, and all of their respective predecessors, successors, assigns, agents, heirs, representatives, executors and administrators.

   b. "Settled Claims" means all claims, demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, asserted or that might have been asserted, including, without limitation, claims for negligence, gross negligence, fraud, negligent misrepresentation, breach of fiduciary duty, or violations of any state or federal statutes, rules or regulations, by any Plaintiff, member of the Class, or the Plan against Settling Defendants or Released Parties arising out of, relating to or in connection to any of the acts, omissions, misrepre-

**112**

sentations, facts, events, matters, transactions or occurrences referred to in the Complaint or otherwise alleged, asserted or contended in the Litigation. Settled Claims includes any claims that the Plan could have brought pursuant to ERISA § 502(a)(2) in the Litigation.

7. Named Plaintiffs, and each of them, on their own behalf and on behalf of the members of the Class and the Plan, expressly waive the provisions of Section 1542 of the California Civil Code (and all other like provisions of law in any other jurisdiction) which provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

8. Upon the Effective Date, as defined in the Stipulation, Settling Defendants shall release Plaintiffs, the members of the Class, and their Counsel from all claims relating to the institution, prosecution or resolution of this Litigation.

9. The Court reserves jurisdiction over: (a) implementation and enforcement of the terms of the Settlement and the Stipulation; (b) the application of Plaintiffs' Counsel for the award of attorneys' fees, expenses and costs; (c) the application of Named Plaintiffs for expenses and reasonable compensation; (d) enforcing and administering the Stipulation including any releases executed in connection therewith; and (e) other matters related or ancillary to the foregoing. This reservation of jurisdiction shall not affect in any way the finality of this Order and Final Judgment.

10. All objections to the Settlement are overruled and denied in all respects.

11. This Court has jurisdiction over the subject matter of this Litigation, and all acts within this Litigation, and over all parties to this Litigation, including all members of the Class.

12. In the event that the Settlement does not become effective or is canceled or terminated in accordance with the terms and provisions of the Stipulation, then this Order

and Final Judgment shall be rendered null and void and be vacated and all orders entered in connection therewith by this Court shall be rendered null and void.

13. There is no just reason for delay in the entry of judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, and the Clerk is hereby directed to enter judgment in accordance with this Order and Final Judgment.

14. Entry of this Order and Final Judgment and final approval of the Settlement settles all claims that have been asserted or could have been asserted in this Litigation.

15. The Court finds that each Party and each attorney representing any Party has complied with the requirements of Rule 11 of the Federal Rules of Civil Procedure.